MILWAUKEE & SUBURBAN TRANS-
PORT CORPORATION, Petitioner,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

No. 13025.

United States Court of Appeals
Seventh Circuit.

Oct. 24, 1960.

J. Roy Browning, Robert Thorsen, Chicago, Ill., Richard R. Teschner, Milwaukee, Wis., Warren W. Browning, Chicago, Ill., Dale L. Sorden, Milwaukee, Wis., Madigan & Thorsen, Chicago, Ill., Browning & Browning, Chicago, Ill., Quarles, Herriott & Clemons, Milwaukee, Wis., of counsel, for petitioner.

Charles K. Rice, Asst. Atty. Gen., Joseph Kovner, Meyer Rothwacks, Harry Baum, Attorneys, Department of Justice, Washington, D. C., for respondent.

Before DUFFY and KNOCH, Circuit Judges, and GRUBB, District Judge.

GRUBB, District Judge.

This is a petition for review of a decision by the tax court disallowing certain deductions by the petitioner in the years 1953 and 1954. There are two issues, one involving the preferred stock of the petitioner and the other involving its accounting method.

#### Preferred Stock Issue

Petitioner is a corporation organized on October 7, 1952, under the laws of the State of Wisconsin. It filed its returns for the taxable years 1953 and 1954 with the Director of Internal Revenue for the District of Wisconsin. It kept its books of account and filed its Federal income tax returns in accordance with an accrual method of accounting and on the basis of calendar years.

In the year 1952 and for several years prior thereto, the public passenger transportation system in the City of Milwaukee and its environs was owned and operated by the Milwaukee Electric Railway and Transport Company (hereinafter called the "Transport Company") which was a wholly owned subsidiary of the Wisconsin Electric Power Company (hereinafter called the "Power Company"). Both the parent and the subsidiary were Wisconsin corporations, and the parent also was a registered public utility holding company subject to the provisions of the Federal Public Utility Holding Company Act of 1935 (Title 15 U.S. C.A. § 79).

During the 1940's the management of the Power Company and of the Transport Company came to realize that by reason of the provisions of the Public Utility Holding Company Act of 1935, it would be necessary to remove the public passenger transportation properties owned by the subsidiary Transport Company from the holding company system of the parent Power Company.

On December 30, 1952, the petitioner purchased the transportation facilities of the Transport Company. The purchase price of $10,000,000 was payable in the following manner: $4,000,000 in cash to be raised by the sale of bonds to outside parties which would be secured by a first mortgage on the assets; $3,000,000 of the petitioner's promissory notes to be issued to the Transport Company and which were secured by a second mortgage; and $3,000,000 in preferred stock to be issued to the Transport Company. In addition, the organizers of the petitioner were to invest a total of $500,000 in common stock of the petitioner in order to supply working capital.

The tax court found as fact that:

" * * * it was the belief of the parties that, if the issuance of the securities by the purchasing corporation was to receive the required approval of the Public Service Commission of Wisconsin (hereinafter called the P. S. C.), the ratio of corporate debt to equity capital could not be too high. Also it was believed that, if the sale was to receive the required approval of the United States Securities and Exchange Commission (hereinafter called the S. E. C.), as a divestiture by the Power Company of the public passenger transportation properties, the preferred stock would have to contain redemption provisions—so that any retention of an ownership interest would be of a temporary rather than a permanent nature."

The material provisions of the purchase contract follow:

"Section 2. * * *

"The base purchase price [of $10,-000,000] to be paid by the Purchaser to the Seller at the closing shall be as follows:

"(a) $4,000,000 in cash;

"(b) $3,000,000 principal amount of the Purchaser's 5% Secured Promissory Notes, secured by a second mortgage covering the Purchaser's bondable transportation property, * * *; and

"(c) 30,000 shares of the Purchaser's 5% Cumulative Preferred Stock, fully paid and non-assessable, having a par value of $100 per share, * * *.

\* \* \* \* \* \*

"The Seller represents that it has no present intention of disposing of the 5% Secured Promissory Notes and the 5% Cumulative Preferred Stock of the Purchaser to be received by it under this Agreement, except to an associate company in the same holding company system, which will in turn acquire such securities with a view to holding them as an investment and not with a view to distribution.

"Section 3. The purchaser agrees that prior to the closing it will issue and sell for cash at not less than the par or stated value thereof, Common Stock having a total par or stated value of at least Five-Hundred Thousand Dollars ($500,000).

\* \* \* \* \* \*

"Section 6. \* \* \*

"(b) The obligation of the Seller hereunder to convey the property to be sold hereunder is subject to the following conditions precedent:

"1. That * * * counsel for the Purchaser shall have given an opinion to the Seller * * * that the 30,000 shares of 5% Cumulative Preferred Stock of the Purchaser to be delivered to the Seller * * * are validly issued, fully paid and non-assessable.

\* \* \* \* \* \*

"Section 7. This agreement is made subject to obtaining all consents, authorizations and orders which shall be required by law to be obtained from any regulatory au-thority in order to carry out the terms of this Agreement, which each of the parties hereto agrees forthwith to apply for and to prosecute with due diligence; * * *."

Article III(a) of the petitioner's amended articles of incorporation provides as follows:

"(a) The capital stock of the corporation shall consist of 30,000 shares of Cumulative Preferred Stock of the par value of $100 each (hereinafter called 'Preferred Stock') and 500,000 shares of Common Stock of the par value of $1.00 each (hereinafter called 'Common Stock')."

The preferred stock certificate contained the following provisions:

"(B) The holders of the preferred stock shall be entitled to receive, when and as declared by the board of directors, out of surplus or net profits, cumulative dividends in cash at the rate of 5% per annum and no more, payable quarter-yearly * * *. Such dividends on the preferred stock shall be cumulative from and after the 30th day of December, 1952.

"(C) The corporation, at the option of the board of directors, may redeem the preferred stock at the time outstanding, in whole at any time or in part from time to time, upon notice duly given as hereinafter specified, by paying therefor in cash the par value thereof, together with a sum equal to 5% per annum on the par value thereof from the 30th day of December, 1952 to the date fixed for redemption, less the aggregate amount of all dividends theretofore paid thereon. * * *

"(D) So long as any shares of the preferred stock remain outstanding, there shall be set aside [annually] as a sinking fund for the retirement of preferred stock, [beginning on a date 15 months after the first mortgage bonds and second mortgage notes had been retired] * * *,

"(1) An amount in cash sufficient to redeem at the redemption price hereinabove provided 3,000 shares of preferred stock; and

"(2) An amount in cash sufficient to redeem an aggregate par value of shares of preferred stock (to the nearest full share) equal to one-half of the net income of the corporation for the above twelve months' period, determined as hereinafter provided.

\*    \*    \*    \*    \*    \*

"For the purposes of this paragraph (D) the term 'net income' shall mean [operating revenue, less operating expenses and dividends on preferred stock, and plus or minus nonoperating income or nonoperating loss] \* \* \*."

Petitioner's attorney advised the Transport Company in a letter dated December 30, 1952, as follows:

"6. The 30,000 shares of Preferred Stock, a temporary certificate for which has been delivered to you today, are validly issued, fully paid and non-assessable. \* \* \*"

The preferred stock was entered on petitioner's books in an account entitled "Preferred Stock." In its annual reports the stock was referred to as preferred stock.

Applications were filed with the Public Service Commission and the Securities Exchange Commission for authority to consummate the transaction, and after various hearings were held, authorization was ultimately obtained. In all proceedings before both of these bodies, the stock in question was always referred to and represented to be preferred stock.

Petitioner, on its tax returns for 1953 and 1954, deducted as "interest" the amount of its payments with respect to the preferred stock, but these deductions were disallowed by the respondent.

■ The question involved in this issue is whether the security denominated "preferred stock" is a debt or an equity investment. Although there are factors present which favor the taxpayer, the court is of the opinion that there is suf-ficient support in the record for the tax court's conclusion that the petitioner's payments to preferred stockholders in the years 1953 and 1954 were actually, as well as in form, dividends and not interest and thus non-deductible.

In Commissioner of Internal Revenue v. Meridian & Thirteenth Realty Co., 7 Cir., 1942, 132 F.2d 182, at page 186, this court made the following statement. in a case very similar to the instant one:.

"It is often said that the essential difference between a creditor and a stockholder is that the latter intends to make an investment and take the risks of the venture, while the former seeks a definite obligation, payable in any event. \* \* \*"

The securities involved in the present case undoubtedly have certain characteristics which would indicate that the investment was not subject to the risks of the venture. For instance, there appears to be a definite maturity date for the stock had to be redeemed by March 1, 1972, at the latest, although an earlier retirement dependent upon the earnings of the corporation was possible. In addition, on the basis of the contract as influenced by Wisconsin corporation law, the redemption price apparently could be paid out of capital or capital surplus and was not dependent on earnings. These factors are persuasive but are not conclusive of the question. John Kelley Co. v. Commissioner of Internal Revenue, 1946, 326 U.S. 521, 66 S.Ct. 299, 90 L. Ed. 278; Commissioner of Internal Revenue v. Meridian & Thirteenth Realty Co., supra; and Lee Telephone Co. v. Commissioner of Internal Revenue, 4 Cir., 1958, 260 F.2d 114.

As intimated earlier, there are other elements which tend to water down the significance of the above-mentioned factors. The maturity date, for example, is contingent to a certain degree for the preferred stock sinking fund does not commence until after $7,000,000 of bonds and notes are retired. The probabilities are that these securities will be paid off on schedule, but this is not certain, and, consequently, the maturity date could.

theoretically be pushed back well beyond the 1972 date.

In addition, the practical effect of such a situation beyond casting a shadow on the definiteness of the maturity date is to subordinate the preferred stock to the debt represented by the bonds and notes. Since, as will be shown later, the preferred stock is also subordinated to general creditors, it is clear that it is very much subject to the risks of the venture.

Under pertinent Wisconsin statutes [1] it appears that the preferred stock could be redeemed out of funds other than earnings. The redemption is restricted as the redemption can only be made if the corporation would not be rendered insolvent. Thus, it is clear that the preferred stock is in fact subordinated to general creditors.

Another characteristic of the preferred stock which tends to support the conclusion of the tax court is the fact that the charter restricts *current* dividends to earnings. Thus, although deferred cumulative dividends could be paid out of capital surplus at redemption, current dividends are restricted to earnings. Also, there are various provisions on the preferred stock certificate, such as that conferring the right to participate in management upon default, which are typical to any preferred stock.

In addition to the characteristics of the security, the intent of the parties as derived from the facts and circumstances surrounding the issuance of the stock strongly supports the tax court's decision.

The securities were called preferred stock, were represented to everyone, including various regulatory bodies, as preferred stock, and were carried on the books of the company as preferred stock. Also, the seller's agent testified that it thought it was getting preferred stock, and this fact is of substantial weight for the petitioner insists that the seller devised the *type*, amount, and the basis upon which the securities would be issued.

In Lee Telephone Co. v. Commissioner of Internal Revenue, 4 Cir. 1958, 260 F. 2d 114, the court found a security to be an equity investment. Among its comments the court noted at pages 115–116:

"Perhaps most important of all, the taxpayer, seeking to comply with applicable financial regulations, sought to place a preferred stock issue, to decrease, rather than increase, the ratio of its debt to its net worth. The attorney for the taxpayer testified that at the time the taxpayer could have borrowed the money at 3 per cent, but the preferred stock was issued at the higher dividend rate because of the requirement of the regulatory commission. * * * "

The decision of the tax court will be affirmed on this point.

### Accounting Method Issue

During the years 1953 to 1954 the petitioner operated approximately 1,000 vehicles. These vehicles were operated in excess of 33 million miles in each year

---

1. 1951 Wisconsin Statutes—"180.38 *Dividends.* * * * (3) The board of directors of a corporation may also, from time to time, distribute to the holders of its outstanding shares having a cumulative preferential right to receive dividends, in discharge of their cumulative dividend rights, dividends payable in cash out of the capital surplus of the corporation, if at the time the corporation has no earned surplus and is not insolvent and would not thereby be rendered insolvent. Each such distribution, when made, shall be identified as a payment of cumulative dividends out of capital surplus."

1951 Wisconsin Statutes—"180.05 *Power of corporation to acquire and dispose of its own shares.* (1) A corporation shall have power to purchase, take, receive, redeem in accordance with their terms, or otherwise acquire, hold, own, pledge, transfer, or otherwise dispose of its own shares; provided that no such acquisition, directly or indirectly, of its own shares for a consideration other than its own shares of equal or subordinate rank shall be made unless all of the following conditions are met:

"(a) At the time of such acquisition the corporation is not and would not thereby be rendered insolvent; * * *."

See also 1953 Wisconsin Statutes, Sections 180.38(3) and 180.385(1) (a).

and carried approximately 281 million passengers in 1953 and 250 million passengers in 1954. In 1953 petitioner's vehicles were involved in 5,903 accidents, and in 1954 there were 5,041 accidents.

Petitioner carried "excess public liability insurance" where liability occasioned by any one accident exceeded $100,000 and was less than $1,000,000, but was a self-insurer where liability was less than $100,000. It maintained a staff of attorneys and claim adjusters to investigate accidents occurring in the course of the operation of its vehicles, to effect settlements, and to defend petitioner in suits brought by parties injured or damaged in such accidents. As of December 31, 1953, there were 414 claims unsettled which had arisen in that year, and as of December 31, 1954, there were 447 unsettled 1954 claims.

The tax court found as fact that:

"At the end of each of the years 1953 and 1954, petitioner's board of directors appointed from their number, a committee of three (two of whom were attorneys) to examine the information gathered by petitioner's attorneys and claim adjusters relating to each of the unsettled claims, and to determine whether in such committee's opinion petitioner was liable, and to what extent. The committee members were assisted in their work for both taxable years, by the petitioner's general claim agent; and in the first of such years they were assisted also by a certified public accountant from the firm which audited petitioner's books of account."

This committee estimated that the petitioner's liability for the 414 unsettled 1953 claims was $254,659. The estimate for the 447 unsettled 1954 claims was $161,136.50.

The petitioner's general claims agent was in each year authorized to settle the pending claims at the amounts at which they had been appraised, but petitioner did not at any time notify or otherwise admit to any of the claimants that it considered itself liable.

In both years petitioner, an accrual basis taxpayer, set up on its books of account as a book liability for unsettled claims the above-mentioned estimates and also debited a related expense account for injuries and damages. On its Federal income tax return for 1953, it claimed a deduction of $254,659. In 1954, it claimed a deduction of $142,022.87 which was computed as follows:

| | | |
|---|---|---|
| Appraised liability on unsettled claims, 1954 accidents ....... | | $161,136.50 |
| Deduct: Appraisal liability of 1953 claims settled in 1954 ... | $94,984.00 | |
| Less: Amounts at which 1953 claims were actually settled ... | 75,870.37 | 19,113.63 |
| Net amount expensed and added to liability account | | $142,022.87 |

———◆———

The respondent, in his statutory notices of deficiency, disallowed the entire amount of $254,659 which was claimed as a deduction on petitioner's 1953 return, and he also disallowed $61,472.79 of the $142,022.87 which was claimed as a deduction on petitioner's 1954 return. The respondent allowed as a deduction in each taxable year the amount of the claims for injuries and damages which actually were settled by the petitioner in each such year.

A substantial number of the unsettled claims for 1953 and 1954 were put into litigation either before or after the close of the taxable year concerned. In all liti-

gated claims the petitioner denied liability in its pleadings. There also was a large number of potential claims which never progressed beyond the point of reports made to petitioner by its employees for the injured parties neither presented claims to petitioner nor filed suit against it.

There were in the two year span 64 claims where the petitioner's committee determined that the petitioner had no liability. Ultimately, however, in 57 of these claims some settlement was made with the claimants.

The tax court further found that:

"As regards claims wherein the committee had estimated that petitioner was liable and settlements were made (either with or without litigation), the settlement amounts were equal to the estimates in only 31 out of 261 of such 1953 claims, and in only 22 out of 254 of such claims. Settlements were at variance with estimates by more than 100 per cent in 97 of said 1953 claims and in 102 of said 1954 claims."

As of the time of trial, there were still 8 unsettled 1953 claims where liability was currently estimated at $14,500, although the original estimate was $5,-200. In addition, there were 13 unsettled 1954 claims currently estimated at $51,-415 and originally estimated at $12,750.

The tax court included in its findings the following table which compares petitioner's estimates with its actual experience:

| Year | Number of claims | Petitioner's estimated liability | Payments actually made in settlement of same, through August 31, 1958 |
|------|------|------|------|
| 1953 | 414 | $254,659.00* | $178,230.24 |
| 1954 | 447 | 161,136.50** | 159,851.84 |

*Includes $34,470, representing 138 unpressed claims.
**Includes $26,521, representing 144 unpressed claims.

———◆———

As the tax court stated:

"The question here presented is whether petitioner, an accrual basis taxpayer, may deduct for each of the years 1953 and 1954, certain amounts accrued by it on its books of account as of December 31 of each year. Such amounts represented its estimate of the probable amounts which it would.have to pay in settlement for personal injuries and property damages, arising out of accidents in which its employees and equipment were involved."

The tax court decided that the aforementioned estimates were not deductible on two grounds. One such ground was that the unsettled claims did not represent fixed liabilities during the year in which the deduction was claimed because some claims were being litigated, and as to all others liability was not admitted.

In other words, all claims were contested. The other reason was that the amount of liability was not ascertainable with reasonable certainty. This was based on the fact that as to individual claims, the estimates were very often at variance with the actual settlements, settlements were made in many cases where a determination of nonliability had been made, and many claims were in effect only potential claims which were in fact never pressed.

As mentioned above, the petitioner keeps its books on an accrual basis. Section 446 of the 1954 Internal Revenue Code, 26 U.S.C.A. § 446, requires the petitioner to compute its income under the method of accounting used in keeping its books unless such method does not clearly reflect income. In the instant case, it is the opinion of the court that petitioner's method of accruing its estimated lia-

bility does clearly reflect its income on an annual basis.

In United States v. Anderson, 1926, 269 U.S. 422, at page 440, 46 S.Ct. 131, 134, 70 L.Ed. 347, the court, when speaking of the purpose of comparable provisions of the earlier Revenue Code, stated:

" * * * It was to enable taxpayers to keep their books and make their returns according to scientific accounting principles, by charging against income earned during the taxable period, the expenses incurred in and properly attributable to the process of earning income during that period; * * *."

The reasoning of the court in United States v. Anderson is equally applicable to the case at bar for there is no question but that the expenses resulting from the various claims are chargeable to the income of the year in which the accident happened. During the trial petitioner produced expert witnesses who testified to the effect that petitioner's procedures were in keeping with generally accepted accounting principles.

■■ While an expense may be logically related to one year or another, it is true that to be deductible as an accrual all events which establish a definite liability in the taxpayer must have occurred during the taxable year, and the amount of such liability must be determinable with reasonable certainty. Dixie Pine Products Co. v. Commissioner of Internal Revenue, 1944, 320 U.S. 516, 64 S.Ct. 364, 88 L.Ed. 420; United States v. Anderson, 1926, 269 U.S. 422, 46 S.Ct. 131. In the instant case, the court feels that these tests have been met by the petitioner.

The petitioner argues, and rightly so, that all events which determine liability have occurred. The accidents out of which the various claims grow undoubtedly have occurred in the years in question, and the physical facts of the accidents are the only events upon which liability is predicated. Although it is true that the petitioner could not have known the full extent of personal injuries in 1953 or 1954 in any particular case, still this has no bearing on liability itself, but instead is concerned with the question of whether an admitted liability is sufficiently fixed.

In this case then, we have a situation where the operative facts have actually occurred although their meaning or even existence are subject to argument. This is in contrast to the situation where the operative facts have not occurred but are highly predictable. In the latter situation, many businesses prudently set up reserves to protect themselves, but they are not deductible as accrued expenses for although intimately related to the income of the earlier year, the events which fix liability have not happened. This is true even though the future expenses are predictable with great accuracy. Brown v. Helvering, 1934, 291 U.S. 193, 54 S.Ct. 356, 78 L.Ed. 725. In the instant case, the expense is related to the income of the earlier year, and the operative facts upon which liability is dependent have occurred.

■ As mentioned previously, one reason for the tax court's refusal to allow a deduction in this case was the fact that some claims were being litigated, and liability was not admitted by petitioner as to the rest. Normally it is true that a contested claim is not deductible. Security Flour Mills Co. v. Commissioner of Internal Revenue, 1944, 321 U.S. 281, 64 S.Ct. 596, 88 L.Ed. 725; Dixie Pine Products Co. v. Commissioner of Internal Revenue, 1944, 320 U.S. 516, 64 S.Ct. 364; and Lucas v. American Code Co., Inc., 1930, 280 U.S. 445, 50 S.Ct. 202, 74 L.Ed. 538.

In all the above-cited cases, there was only a single claim being contested. In such a situation, it is obvious that (1) there may or may not be liability depending on the outcome of the contest, and (2) the amount of the liability is quite often uncertain.

In the present situation there are numerous claims, and assuming at this point that in the aggregate the amount of liability is predictable, neither of the above reasons for not allowing a deduc-

tion is pertinent. In the first place, although all claims are contested, this is not a situation where there may or may not be liability, depending on the outcome of the contest. Because of the number of claims, it is apparent to everyone that there is going to be liability, and the only question is in which particular claims this liability will occur. The same line of reasoning applies to the objection that the amount of liability is dependent on the contest. If overall liability can be accurately predicted, there should not be any objection to the fact that it cannot be tied down securely in any particular claim.

In Ocean Accident & Guarantee Corp., Ltd. v. Commissioner of Internal Revenue, 2 Cir., 1931, 47 F.2d 582, at page 584, a case directly in point, the court stated:

"This brings us to the question whether the deduction claimed by petitioner was an 'accrued' loss. It was an aggregate of estimates of policy losses likely to be suffered on account of all accidents or injuries reported to petitioner during the taxable year. As to some cases, the petitioner may have admitted liability in the amount of the estimate set up on its record card, and so might come within the terms of Article III of Regulations No. 45 as to a deductible loss under clause (4) of section 234(a). But most of the estimates of liability were not of that character. Each one, viewed alone, would be too contingent as to payment and too uncertain as to amount to be deductible as a 'loss sustained.' Lucas v. Am. Code Co., 280 U.S. 445, 50 S.Ct. 202, 203, 74 L.Ed. 538. But the question is whether the aggregate of estimated unpaid losses for any year may not be taken as an aggregate of accrued losses, though each one separately, or at least most of them, would be contingent and unpredictable. The business of insurance presupposes that the insurer is able to treat as accurately computable and predictable an aggregate of variables no one of which is either computable or predictable. Without that the business must fail, and only past experience permits any estimate as to the extent to which the variations cancel each other. But the business does go on and with a certainty greater than most others. Here the accrued losses were predictable with remarkable accuracy, the business of petitioner being large enough to disregard the contingencies inherent in each loss taken alone. *To assimilate such a situation to a single loss is, in our opinion, to close one's eyes to the substance of the business.* We do not think the American Code Case so requires. * * *" (Emphasis added.)

The tax court was of the opinion that regardless of the question of a definite fixed liability, the expenses involved in this case could not be estimated with any reasonable certainty. Basically this view was bottomed on the fact that individually the claims were quite difficult to evaluate, and in many cases actual settlement figures differed radically from the estimates made. This view ignores the fact that in the aggregate the unsettled claims are susceptible of reasonably accurate estimation as was recognized in the Ocean Accident decision, supra.

A comparison of the petitioner's aggregate estimates with actual settlement figures for the years 1953 and 1954 follows:

*1953 Estimate*—$254,659.00

| | |
|---|---|
| Cost of 1953 cases settled | $178,230.24 |
| Current estimate of unsettled cases | 14,500.00 |
| Total | $192,730.24 |

*1954 Estimate*—$161,136.50

| | |
|---|---|
| Cost of 1954 cases settled | $159,851.84 |
| Current estimate of unsettled cases | 51,415.00 |
| Total | $211,266.84 |

While it is apparent from these figures that petitioner was not able to estimate

its liability with mathematical precision, this need not deter the deduction for it is only necessary that the estimate be reasonably certain. Harrold v. Commissioner of Internal Revenue, 4 Cir., 1951, 192 F.2d 1002; Denise Coal Co. v. Commissioner of Internal Revenue, 3 Cir., 1959, 271 F.2d 930; and Hilinski v. Commissioner of Internal Revenue, 6 Cir., 1956, 237 F.2d 703.

For example, a deduction was allowed in the Harrold case although the expense which was estimated at $31,090 was covered by an actual expenditure of only $25,210.18. See also Patsch v. Commissioner of Internal Revenue, 3 Cir., 1953, 208 F.2d 532, which specifically approved this holding of the Harrold decision, and Denise Coal Co. v. Commissioner of Internal Revenue, supra.

Under the circumstances of this case, the court is of the opinion that a reasonably certain estimate was made with due regard for the actual facts and conditions underlying each claim. The estimates here were made in good faith during the early period of the petitioner's corporate existence, were carefully considered, and can in no way be equated with the arbitrary figures used by the taxpayer in Patsch v. Commissioner of Internal Revenue, supra. Also of some interest is the fact that when the two years of 1953 and 1954 are considered together, the petitioner's estimates are accurate to within 2.9 per cent.

The volume of accidents here involved is substantial. It is probably as substantial as that of a small insurance company. The volume is sufficient so that the overall reserve can be fixed with reasonable accuracy notwithstanding the fact that as to any one case, claim, or potential claim it may not be accurate. With this volume of accidents, the total liability can be predicted with reasonable certainty as to any one year. Where such volume exists, it is the opinion of the court that the taxpayer is justified in following the standard accounting practices for this type of operation. There is no intimation here that the taxpayer was endeavoring to accomplish any illegitimate purpose with reference to the deduction for its estimated liability.

The decision of the tax court is reversed on this point.