MIKE PERSIA CHEVROLET, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 88775. Filed November 15, 1963.

*Stanley Schoenbaum*, for the petitioner.
*John D. Laflin*, for the respondent.

### OPINION

DRENNEN, *Judge:* Respondent determined a deficiency in petitioner's income tax for the taxable years 1956 and 1957 in the amounts of $64,609.96 [1] and $24,060.61, respectively. The only issue remaining for

---

[1] In his answer to amendment to petition, respondent admitted that he erred in his deficiency notice in asserting an additional tax of $1,147.07 for the year 1956 based on the application of section 481, I.R.C. 1954.

decision is whether petitioner is entitled to deduct an addition to a reserve for bad debts under section 166(c), I.R.C. 1954,[2] with respect to amounts retained by finance companies, upon discount of petitioner's sales contracts, as security for payment under petitioner's guaranty agreement.

This case was submitted under Rule 30 of the Rules of Practice of the Tax Court of the United States with all the facts being stipulated by the parties. The stipulated facts are incorporated herein by this reference.

Petitioner is a corporation, organized and existing under the laws of the State of Texas, with its principal office in the city of San Antonio, Tex. Petitioner was incorporated on December 1, 1955. The name of petitioner was changed from its original name, Mike Persia Chevrolet, Inc., to Tom Benson Chevrolet Co., Inc., in January 1963.

Petitioner maintains its books and records and files its income tax returns on an accrual method of accounting and on a calendar year basis. It filed its income tax returns for the calendar years 1956 and 1957 with the district director of internal revenue, Austin, Tex.

Since the inception of its business in December 1955, petitioner has sold a substantial part of its automobiles (other than fleet sales) on conditional sales contracts. Under such contracts, some cash and/or trade-in value of a used car is received from the purchaser at the time of the purchase and a contract is given by the purchaser for the balance due, plus interest.

As a matter of business practice, petitioner sold and assigned these contracts to finance companies in order to provide adequate working capital.

During the years 1956 and 1957, petitioner sold and assigned the major portion of these sales contracts to General Motors Acceptance Corp. (hereafter referred to as GMAC), pursuant to "The GMAC Retail Plan." Under the assignments to GMAC petitioner guaranteed payment of the outstanding balance on these sales contracts in the event of default on the part of the automobile purchaser, except as otherwise provided by the retail plan.[3] Under the plan GMAC

---

[2] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.

[3] The assignment form, affixed to the conditional sales contract, provided in part as follows:

"For value received, the undersigned does hereby sell, assign and transfer to the General Motors Acceptance Corporation his, its or their right, title and interest in and to within contract, herewith submitted for purchase by it, and the property covered thereby and authorizes said General Motors Acceptance Corporation to do every act and thing necessary to collect and discharge same.

\*          \*          \*          \*          \*          \*          \*

withheld, during the years involved, 1 percent of the original principal amount of the contracts for each year the contracts were in effect,[4] and credited this amount to petitioner's dealer reserve account, subject to GMAC's right at any time to apply the same in satisfaction of any obligation of petitioner to GMAC, whether or not such obligation resulted from petitioner's guaranty. Under the plan GMAC charged this account with defaults in the purchasers' payments and would periodically pay to petitioner the amount, if any, by which the amount of aggregate credits held by GMAC at the time exceeded a designated percentage of the aggregate amount of the unpaid balances under contracts theretofore purchased.

Approximately 5 percent of the conditional sales contracts received by petitioner in the years involved were assigned to Associates Investment Co. (hereafter referred to as AIC) without recourse. A portion of the principal amount of such contracts was withheld by AIC. In the event of the failure of the automobile purchaser to pay the amounts due under the assigned contract, AIC would charge such default against these withheld amounts.

The balance of petitioner's dealer reserve accounts in the hands of finance companies was $3,824 on January 1, 1956. During the year 1956, $165,870 was added to the dealer reserve accounts, payments by the finance companies to petitioner amounted to $31,891, and $11,916 was charged against the reserve by the finance companies, leaving a balance at December 31, 1956, in the dealer reserve accounts of $125,887.

During the year 1957, $141,303 was added to the dealer reserve accounts, and $95,052 was charged against the reserves by the finance companies, leaving a balance at December 31, 1957, of $172,138. There were no payments made by the finance companies to petitioner in the calendar year 1957 with respect to the dealer reserve accounts.

The experience of petitioner as of December 31, 1956, and December 31, 1957, was that 80 percent of the balance in petitioner's dealer reserve accounts held by the finance companies would not ultimately be collected by petitioner.

The amount in petitioner's dealer reserve accounts with the finance companies is shown as an asset with the designation "Due from finance companies upon their realization of notes sold to them" on its balance sheets of December 31, 1956, and December 31, 1957. There

---

"In consideration of your purchase of the within contract, undersigned guarantees payment of the full amount remaining unpaid thereon, and covenants if default be made in payment of any instalment therein to pay the full amount then unpaid to General Motors Acceptance Corporation in San Antonio, Bexar County, Texas, upon demand, except as otherwise provided by the terms of the present General Motors Acceptance Corporation Retail Plan. * * *"

[4] As stipulated. The GMAC retail plan indicates contracts are purchased by GMAC at a discount but we have no evidence on this with respect to the contracts here involved.

is an offsetting liability of the same amount under a deferred income account designated "Unearned finance charges."

Petitioner's 1956 and 1957 income tax returns reflect the use of the reserve method of accounting for bad debts and respondent has not challenged the use of such method.

Petitioner made an election under sections 4(a) and 4(b) of the Dealer Reserve Income Adjustment Act of 1960. Pursuant to this election petitioner included $122,044.32 in income in the year 1956, $46,270.45 in income in 1957, and deducted $45,045.07 from income (reflecting a decrease in the dealer reserve balance) in 1958.

In the notice of deficiency respondent determined that petitioner's taxable income for the years 1956 and 1957 should be increased by the amounts of $125,867.58 and $46,270.42, respectively, "to properly report income on the accrual basis the amounts withheld on sales by them to finance companies of installment paper received from customers and credited to 'Dealers Reserve Account.' " [5] In its petition filed herein, petitioner acknowledged that these amounts were includable in its income for 1956 and 1957 but contended that it was entitled to a deduction in the amount of the increases in the reserve for each year as an addition to its reserve for bad debts under section 166(c). On brief petitioner contends that a reasonable addition to its reserve would be 80 percent of the increases in the reserve balances for each year. Respondent contends that no such deduction is allowable under section 166(c). We agree with respondent.

Section 166(a) provides for the deduction by a taxpayer of any debt which becomes worthless within the taxable year. Section 166(c) provides that in lieu of any deduction under section 166(a) a taxpayer shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts.

Section 1.166–1, Income Tax Regs., provides in pertinent parts as follows:

(a) *Allowance of deduction.* Section 166 provides that, in computing taxable income under section 63, a deduction shall be allowed in respect of bad debts *owed to the taxpayer.* [Emphasis supplied.] For this purpose, bad debts shall * * * be taken into account either as—

(1) A deduction in respect of debts which become worthless in whole or in part; or as

---

[5] While this statement in the deficiency notice would indicate that respondent added to income the entire amount credited to the reserve each year, a comparison with the stipulated beginning and ending balances in the reserves, and the debits and credits thereto, as set out above, indicates that the amounts added to income were the net increases in the reserve balances, after deducting charges to the reserves during the years. The discrepancy between the $125,867.58 figure for the year 1956 in the deficiency notice and the $122,063 actual increase in the reserve balance for 1956 results from respondent's failure to give credit for the $3,823 opening balance in the reserves for 1956, which respondent concedes, and a switch of approximately $19 from 1956 to 1957.

(2) A deduction for a reasonable addition to a reserve for bad debts.

\*     \*     \*     \*     \*     \*     \*

(c) *Bona fide debt required.* Only a bona fide debt qualifies for purposes of section 166. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. \* \* \*

In *Wilkins Pontiac,* 34 T.C. 1065 (1960), we held that an automobile dealer which sold its conditional sales contracts to GMAC without discount and with full recourse, under an assignment form similar to the one used here, could not deduct an addition to a "Reserve for Losses on Contracts Discounted" relative to those contracts. The basis for our decision was that after selling the contracts the dealer was simply a guarantor who, under *Putnam* v. *Commissioner,* 352 U.S. 82 (1956), could deduct his losses on the guaranties only as a bad debt under section 166, and that there was no debtor-creditor relationship between the debtor and the guarantor, and no debt owing to the guarantor, until the guarantor paid the creditor—and that there could be no deduction under section 166 in the absence of a debt owing to the dealer. The Court of Appeals for the Ninth Circuit reversed this Court in *Wilkins Pontiac* v. *Commissioner,* 298 F. 2d 893 (1961), holding that the taxpayer was entitled to deduct a reasonable addition to a reserve for bad debts under section 166(c) with respect to existing debts to which the taxpayer in the ordinary course of business might ultimately sustain a bad debt loss.

In *Foster Frosty Foods, Inc.,* 39 T.C. 772 (1963), in a Court-reviewed opinion which is now on appeal in the Court of Appeals for the Tenth Circuit, we reexamined the position we had taken in *Wilkins Pontiac* in the light of the reversal by the Ninth Circuit and concluded that our decision in *Wilkins Pontiac* was correct and that the discounted notes there involved, not being debts due the petitioner, could not be considered in determining a reasonable addition to the taxpayer's reserve for bad debts. With all due respect to the Court of Appeals for the Ninth Circuit,[6] and inasmuch as this case arose in the Fifth Circuit, we are constrained to follow our prior decisions in the above two cases, and find that they are dispositive of the issue in this case in favor of respondent.

In our opinion, what petitioner is actually seeking here is a deduction for additions to a reserve for losses it may incur in the future as guarantor of the sales contracts sold to the finance companies. We find no provision in the law which allows such a deduction. See *Commissioner* v. *Milwaukee & Suburban Transport Corp.,* 367 U.S. 906 (1961), reversing per curiam 283 F. 2d 279 (1960), in which

---

[6] And with recognition of the fact that the result it reached in *Wilkins Pontiac* v. *Commissioner,* 298 F. 2d 893 (C.A. 9, 1961), might be desirable from an accounting standpoint.

the Seventh Circuit had permitted deduction of reserves set up for unsettled and potential claims for accidents occurring during the year. The Supreme Court reversed in the light of its decision in *American Automobile Association* v. *United States*, 367 U.S. 687 (1961), wherein it relied on the repeal of sections 452 and 462, I.R.C. 1954, as indicating a congressional disapproval of deferring prepaid income and deducting reserves for future expenditures. See also *Simplified Tax Records*, 41 T.C. 75 (1963).

Petitioner argues that this case is distinguishable from *Wilkins Pontiac* and *Foster Frosty Foods, Inc.*, *supra*, because in *Wilkins Pontiac*, at least, there were no amounts withheld by the finance company, and in both cases this Court was concerned only with the fact that the discounted notes or contracts were not debts due the taxpayers and hence could not be considered in determining a reasonable addition to their reserves for bad debts. The main thrust of petitioner's argument is that here a dealer reserve account was withheld by GMAC similar to that involved in *Commissioner* v. *Hansen*, 360 U.S. 446 (1959), wherein the Supreme Court held that the amounts so withheld were accrued income to the dealer because at the time the finance company entered the withheld amount on its books, as a liability to the dealer, the dealer acquired a fixed right to receive the amount so retained. Therefore, reasons petitioner, there was a debtor-creditor relationship existing between GMAC and petitioner with GMAC being indebted to petitioner for the balance in the reserve account, against which a reserve for bad debts could and should be established. Because it was stipulated that the experience of petitioner "was that eighty per cent (80%) of the balance in the Petitioner's dealer reserve accounts held by the finance companies would not ultimately be collected by the Petitioner," it follows, argues petitioner, that it is entitled to deduct as a reasonable addition to its reserve for bad debts "80% of the respective increases in petitioner's income for the years 1956 and 1957, based on including as income the balances in the dealers' reserve accounts held by the finance companies."

A review of the records in *Wilkins Pontiac* and *Foster Frosty Foods* indicates that there were amounts withheld by the banks in dealer reserve accounts in the latter case, and that there probably were amounts withheld by GMAC in a dealer reserve account in the former case,[7] but admittedly the argument presented by petitioner here was not presented or considered by this Court in either of those cases.

---

[7] The stipulation of facts in *Wilkins Pontiac*, 34 T.C. 1065 (1960), makes one reference to "dealer's reserve," as repeated at the top of page 1067 of this Court's opinion. We also assume that GMAC would be consistent in requiring a "dealer's reserve" from all dealers.

However, we are not convinced that we should reach an opposite conclusion because of this argument.

As heretofore stated, what petitioner is actually seeking to deduct here is a reserve for losses it may incur as guarantor of the sales contracts. We know of no provision in the law for deducting such a reserve and, as we held in *Wilkins Pontiac* and *Foster Frosty Foods*, a loss petitioner may suffer on the guaranty does not become a loss from a bad debt until petitioner is required to pay the purchaser's debt to the finance company under the guaranty. Petitioner is not really seeking a deduction for an addition to a reserve for debts owing petitioner by GMAC which will become worthless. If such were the case petitioner must fail because there is no evidence that GMAC could not and would not pay the full amount it owed petitioner, and there would be nothing upon which we could determine the reasonableness of the deduction. The same is true with respect to the reserve account held by AIC. Petitioner claims that the reasonableness of the deduction sought is supported by the stipulated fact that its experience indicated that it would ultimately collect only 20 percent of the balance in the dealer reserve accounts. But this is only because the so-called liability or debt of the finance companies to petitioner for the amount in the reserve accounts is offset by petitioner's contracts with them permitting them to offset against such liabilities the amounts petitioner might become obligated to pay to the finance companies not only as guarantor of the sales contracts but, with respect to GMAC at least, for any other reason. The reserve accounts were more like deposits to secure performance of its guaranty obligations by petitioner than true debts from the finance companies to petitioner. Petitioner's losses would become deductible when it was required to reacquire the worthless debts of the purchasers, and not before, absent some provision in the law allowing a deduction of reserves for anticipated losses other than from bad debts—of which we are not aware.[8]

Petitioner made an election under sections 4(a) and 4(b) of the Dealer Reserve Income Adjustment Act of 1960. 74 Stat. 124. This required it to recompute its correct income on the accrual method of accounting in the light of the *Hansen* decision, by including in its income for the years 1956 and 1957 all credits to its dealer reserve accounts which had not been included in its original returns. Both petitioner, in its computations attached to its election, and respondent, in his notice of deficiency herein,[9] increased petitioner's reported income by the difference between the beginning and ending balances in

---

[8] We do not think this is a question of the proper method of accounting. The question is whether the tax law allows the deduction, see *Wilkins Pontiac, supra,* regardless of how inequitable the result may seem.

[9] Except for the adjustments heretofore noted in footnote 5.

petitioner's dealer reserve accounts for each year. While no issue has been raised with respect to these computations, we feel constrained to observe that the net increase in the balances in the dealer reserve accounts for both years, according to the stipulated facts, took into account the actual losses incurred on the sales contracts in each of those years which were charged to the dealer reserve accounts. As we view it, this means either that the entire gross amounts credited to the dealer reserve accounts each year by the finance companies were not taken into petitioner's income, as the *Hansen* case would seem to require, or that petitioner has automatically been allowed deductions for losses on the contracts which actually became worthless during those years and were charged off. The latter would seem inconsistent with deducting an addition to a reserve for bad debts arising out of those contracts.

We hold for respondent on the issue involved, subject to the adjustments heretofore mentioned.

*Decision will be entered under Rule 50.*