Glenn L. Bolling and Ila L. Bolling, et al. [1] v. Commissioner. Bolling v. Commissioner
Docket Nos. 2552-62 - 2555-62.
United States Tax Court
T.C. Memo 1964-143; 1964 Tax Ct. Memo LEXIS 192; 23 T.C.M. (CCH) 865; T.C.M. (RIA) 64143; May 22, 1964
William H. Curtis and Roy C. Hormberg, Bryant Bldg., Kansas City, Mo., for the petitioners. Arthur B. Bleecher, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined the following deficiencies in income tax: 1958
1959
1960
1961
Glenn L. Bolling and
$6,632.29 [2]
$14,323.11 [2]
Ila L. Bolling
Mae L. Hausmann
2,755.08 [2]
4,716.41 [2]
Fairhills Company
$830.03 [3]
5,242.50 [3]
4,452.24 [3]
B & H Homes, Inc.
$20,071.16 [4]
*193 The issues remaining before us are as follows: (1) Whether accrual basis home builders and sellers acting as loan guarantors for customers must include in income in the year of sale portions of sales proceeds pledged as loan security to the lender, which lender thereby granted loans to the sellers' customers in excess of the usual maximum amounts; and, if so, (2) Whether petitioners are entitled to deductions for additions to bad debt reserves pursuant to section 166(c). [5]
Findings of Fact Some of the facts have been stipulated and are so found. Petitioners' income tax returns for the taxable periods in question, excepting those of petitioner Mae L. Hausmann (hereinafter called Hausmann), were timely filed with the district director of internal revenue, Kansas City, Missouri. Hausmann timely filed her income tax returns for the calendar years 1959 and 1960 with the district director of internal revenue, Wichita, Kansas. The petitioners were engaged in the construction and sale of low and *194 moderate priced homes in the Kansas City, Missouri area during some or all of the periods in issue. Glenn L. Bolling (hereinafter called Bolling) and Hausmann operated through two accrual basis partnerships' Bolling-Hausmann Builders (hereinafter called Builders) and Bolling-Hausmann Development Company (hereinafter called Development), and two accrual basis corporations, Fairhills Company (hereinafter called Fairhills) and B & H Homes, Inc. (hereinafter called B & H). Prospective purchasers of petitioners' housing could not usually afford large down payments. An arrangement was therefore entered into with Home Savings Association of Kansas City, a savings and loan association incorporated in Missouri (hereinafter called Association). Association's usual policy was to limit home loans to a maximum of 80 percent of appraised value. In the instant context, Association agreed to lend up to 95 percent of appraised value to customers of petitioners. In return, the relevant seller-petitioner agreed to assign to Association as collateral a share account of Association equal to the difference between 90 percent of Association's appraised value and the amount loaned. (In some sales by Fairhills, *195 the collateralized amount was the difference between 80 percent of Association's appraised value and the amount loaned). A minimum down payment of 5 percent of the appraised value was usually required; the collateral share accounts averaged approximately 3.5 percent of the face value of the loans; and the Mortgage Guarantee Insurance Company, a stock insurance company, guaranteed the upper 20 percent of some of the loans to Association, but never in excess of 90 percent of the appraised value. Collateral assigned by a seller and deposited as security for a loan to a home purchaser was credited to one of three pooled accounts, that is, to a pooled account in the name of Builders, Fairhills or B & H. In the event Association sustained a foreclosure loss regarding a loan to a home purchaser, which loss might include sale, repair, title and unearned interest expenses, the entire amount of such loss would be reimbursed from the pooled account of the relevant petitioner. Interest was paid on amounts in these accounts; deposits were credited on Association's books to the relevant petitioner; but no pass books were issued to petitioners regarding these accounts. Petitioners did not contemplate *196 release of amounts in the security deposit accounts until several years after deposits. The Association entered into separate agreements with Builders, Fairhills and B & H, but the essential operative paragraphs of those instruments were similar and provided substantially the following: AGREEMENT This agreement made and entered into by and between the Home Savings Association of Kansas City hereinafter referred to as the "Association" and Bolling-Hausmann Builders hereinafter referred to as "Sellers" is as follows: THE LOAN (1) Home Savings agrees to lend to borrowers upon their proper application up to 95% of the Association's appraisal of the value of the property provided that the Seller pledges and assigns to Home Savings as collateral a share account of Home Savings equal to the difference between 90% of the Association's appraisal and the loan applied for. The term of the loan shall not exceed 25 years and the interest rate shall be at least 6%. THE COLLATERAL (2) The collateral shall earn a dividend at the current rate and shall be payable to the Seller at the regular dividend paying periods. It is further agreed that all loans under this agreement shall be enumerated *197 on the attached schedule and shall become a part of this agreement and is hereby incorporated by reference, and that the collateral share account shall be in one account for the entire group of loans so enumerated and this account shall be designated as Share Account No. 7-57507. (3) Association shall collect 1% fee of the Association's loan to the permanent borrower. It is further agreed that the Association shall be entitled to Construction Loan Commission to be mutually agreed upon on any construction loan which later develops into a permanent loan under this agreement. Interest on such construction funds to be at the rate of 6% per annum. The 1% fee above mentioned shall be payable by the seller or buyer at the time the loan is closed. COLLATERAL RELEASE (4) Beginning at the end of the first year and each succeeding year thereafter, an exact determination shall be made of the amount of principal reduction accomplished by the payments on the loan in the first fiscal year and the collateral will be released on the basis of the formula of $100.00 shall be due the Sellers when the principal reduction of $200.00 shall have been accomplished by amortization during the year. The same *198 formula shall be applied on each succeeding year with the further agreement that collateral release on all loans shall be figured no more frequently than once each year and then only on all houses comprising the subject of this collateral agreement. (a) As a condition for release of collateral it is agreed that all payments due on the loan shall have been made by the borrowers and no delinquency shall exist longer than 30 days, and subject further to property being in a satisfactory condition of maintenance. (b) It is further agreed by the Association that in case of an accelerated payment by a borrower in excess of normal monthly payments that the collateral release shall be increased to entitle the Seller to two-thirds of the amount of principal reduced by such accelerated payments. (c) Notwithstanding the accelerated amortization due to prepayment or pay-off of the loan, $300.00 of collateral shall remain for each loan under this agreement until under a normal amortization would entitle Seller to collateral release under the schedule outlined in (4). (5) In the event of foreclosure against any property enumerated herein in which the Association does not receive proceeds *199 from the sale equal to the outstanding balance plus usual expenses Seller hereby authorizes Home Savings to apply such amount from the above numbered collateral share account to make up the deficiency including necessary repairs to place property in a marketable condition as the judgment of the Association determines. The Association agrees to make a reasonable effort to notify the Sellers prior to beginning of any foreclosure. (6) If such collateral is applied as specified in paragraph No. 5 and results in a depletion of the collateral pledged partial release provisions will be suspended until there is sufficient collateral deposited to maintain the original loan exposure contemplated of all the loans in the enumerated list. (7) This agreement shall be revocable by the Association or by either party upon 30 days written notice to the Seller. (8) All collateral release shall be suspended if the Sellers are delinquent in any obligation they have incurred to this Association on any other transaction in which Glenn L Bolling and Mae L. Hausmann have any financial interest involving Home Savings. The provisions of this Paragraph No. 8 will also apply to the heirs and assigns of the *200 Sellers. In addition to an agreement akin to the above, Fairhills and Association entered into another agreement, which provided inter alia the following: For and in consideration of a minimum of 20 loans to be made by the Association to borrowers who qualify under the Association's underwriting requirements the Sellers hereby agree to the following terms and conditions set out herewith. THE LOAN (1) Home Savings agrees to lend to borrowers upon their proper application up to 95% of the Association's appraisal of the value of the property provided that the Seller pledges and assigns to Home Savings as collateral a share account of Home Savings equal to the difference between 80% of the Association's appraisal and 95% of the appraisal. The term of the loan shall not exceed 25 years and the interest rate shall be 6% per annum. (a) In the event that there is a down payment by the borrower which lowers the loan to less than 90% of the appraisal, the amount of collateral required will be adjusted to the following schedule. % Down Payment
% Collateral
10
10
12
9
14
8
16
7
18
6
20
5
25
2 1/2
26
2
29
1/2 Notwithstanding the above schedule it is understood *201 and agreed that at least 15 of the 20 loans comprising a group shall have pledged collateral in an amount equal to at least 5% of the loan. The remaining provisions were similar to those contained in the other agreements. Fairhills paid commissions to Association through the following reductions of its pledged collateral accounts: Fiscal Year ended
Amount
March 31, 1958
$ 796.22
March 31, 1959
2,853.03
March 31, 1960
1,018.46
Pursuant to the agreements, the following amounts were credited in collateral accounts during the periods indicated: Builders
Taxable year ended 1959
$17,892
Taxable year ended 1960
30,362
Fairhills
Fiscal year ended March 31, 1958
$ 3,689
Fiscal year ended March 31, 1959
17,485
Fiscal year ended March 31, 1960
8,562
B & H
Fiscal year ended June 30, 1961
$38,082.50
The proper allocation of the collateral deposits to the account of Builders as between Bolling and Hausmann is as follows: 1959
1960
Bolling
$11,928
$21,511.48
Hausman
5,964
8,850.52
Total
$17,892
$30,362.00
During periods hereto material, Builders (and as a consequence Bolling and Hausmann as partners) *202 and Fairhills, with one exception, did not report as income that part of home sales proceeds which was deposited in the collateral security accounts. The one exception was Fairhills reporting as income 25 percent of such deposits in its fiscal year ended March 31, 1958. Neither Builders nor Fairhills reflected any reserve for bad debts or additions thereto relative to these amounts on any income tax return. Builders and Fairhills included the pledged amounts as sale proceeds on their own books of account, but offset the deposited sums by so-called "contra accounts," with one Fairhills exception. Petitioners' accountant considered a "contra account" to be one of two related accounts which offsets the other account. B & H, in contrast to Builders and Fairhills, did include in income that portion of sales proceeds reflected in collateral security accounts for the one fiscal year here relevant. B & H claimed a deduction equal to the amount of the share accounts pledged during that year by setting up a reserve for bad debts. The amounts deposited as security for Association regarding loans to home purchasers did not reduce the amount of income derived from the relevant sales and, as part *203 of the sales proceeds, were income to petitioners in the year of sale. Petitioners are not entitled to deductions for additions to reserves for bad debts. Opinion The first issue is whether accrual basis home sellers acting as loan guarantors for customer-home-buyers must include in income in the year of sale portions of sale proceeds pledged as loan security to the lender. The instant issue is substantially the same as that decided in Key Homes, Inc., 30 T.C. 109, affirmed per curiam 271 F. 2d 280 (C.A. 6), and we are not persuaded that our views should be changed. See also E. J. Gallagher Realty Co., 4 B.T.A. 219. Cf. Barham v. United States, 256 F. 2d 456 (C.A. 4). On this record, petitioners have failed to sustain their burden of proving that the instant factual context presents additional contingencies of a magnitude sufficient to alter the rule of Key Homes, Inc. See also Commissioner v. Hansen, 360 U.S. 446. We find for the respondent on this issue. In the alternative, petitioners aver that they may properly claim deductions for additions to bad debt reserves for the relevant transactions. The statute *204 allows deductions for additions to reserves for bad debts in lieu of specific bad debt deductions in the discretion of the Commissioner, [6] and the Commissioner's regulations provide various procedures regarding such matters. [7] Neither Builders nor Fairhills ever specifically established an account labelled as a reserve for bad debts, nor did they ever claim a deduction for an addition to a bad debt reserve on any income tax return. Petitioners argue that the internal bookkeeping arrangement of Builders and Fairhills, whereby pledged amounts were considered as sales proceeds and offset with negative entries called "contra accounts," satisfies the statutory provisions. While we need not decide the question, it may well be that Builders and Fairhills have not complied with the statute and corresponding regulations regarding bad debt reserves. See and compare Colorado County Federal Savings & Loan Assn., 36 T.C. 1167, affirmed per curiam 309 F. 2d 751 (C.A. 5); Rio Grande Building & Loan Association, 36 T.C. 657; Krim-Ko Corporation, 16 T.C. 31; Atlantic Bank & Trust Co., 23 B.T.A. 1219, aff'd 59 F. 2d 363 *205 (C.A. 4).
*206 This alternative issue regarding bad debt reserves has been settled for all the petitioners (including B & H which reported pledged amounts as income and which asserted an addition to bad debt reserve deduction (by Wilkins Pontiac, 34 T.C. 1065, reversed 298 F. 2d 893 (C.A. 9). The substance of the instant arrangement was that the petitioner-seller guaranteed the lender against loss on loans granted to petitioner's customer. The only event which would establish an economic loss for petitioner would be default on a loan by the customer followed by foreclosure loss by the lender. In such event, the guarantee would become effective and the guarantor-petitioner would reimburse the lender to the extent of the foreclosure loss. This situation comes within the ambit of the rule of Wilkins Pontiac, which holds that guarantor situations are not within the purview of the bad debt reserve provision. This Court has reaffirmed its Wilkins Pontiac position in Mike Persia Chevrolet, Inc., 41 T.C. 198 and Foster Frosty Foods, Inc., 39 T.C. 772, on appeal (C.A. 10). We realize that the economic realities justify deductions for a reasonable amount *207 of additions to bad debt reserves. There is the possibility that petitioners will suffer bad debt losses regarding some of the relevant amounts. See Putnam v. Commissioner, 352 U.S. 82, where it is established that such losses will be deductible under section 166(a) when incurred. In view of the long period which petitioners must remain liable in the instance case, and with cognizance of the "boom and bust" nature of the building trade, it does seem unfair that petitioners are not allowed to afford themselves the benefit of bad debt reserves. Income is bunched in "boom" years and corresponding deductions in "bust" years may be of little value. Yet it is a cliche that deductions are a matter of legislative grace. See, e.g., New Colonial Co. v. Helvering, 292 U.S. 435, 440. Section 166(c), in referring to section 166(a), requires that a "debt" exist; no such debt has been established in the case at bar. We have sympathy with the views of the Ninth Circuit as reflected in Wilkins Pontiac, supra, and the District Court of Mississippi, Family Budget Service Inc. v. United States, - F. Supp. - (D. Miss.), but we believe the statute does not justify *208 the claimed deductions. This is one of those unhappy situations where the statute needs correction; it is for Congress, not the courts, to make the necessary changes. Because of concessions. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Mae L. Hausmann, Docket No. 2553-62; Fairhills Company, Docket No. 2554-62; and B & H Homes, Inc., Docket No. 2555-62.↩
2. Calendar year ended December 31. ↩
3. Taxable year ended March 31. ↩
4. Taxable year ended June 30.↩
5. Unless otherwise noted, all references are to the I.R.C. of 1954.↩
6. SEC. 166. BAD DEBTS. * * *
(c) Reserve For Bad Debts. - In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts. ↩
7. Sec. 1.166-1, Income Tax Regs. Bad debts. (a) Allowance of deduction. Section 166 provides that, in computing taxable income under section 63, a deduction shall be allowed in respect of bad debts owed to the taxpayer. For this purpose, bad debts shall, subject to the provisions of section 166 and the regulations thereunder, be taken into account either as - (1) A deduction in respect of debts which become worthless in whole or in part; or as (2) A deduction for a reasonable addition to a reserve for bad debts. (b) Manner of selecting method. (1) A taxpayer filing a return of income for the first taxable year for which he is entitled to a bad debt deduction may select either of the two methods prescribed by paragraph (a) of this section for treating bad debts, but such selection is subject to the approval of the district director upon examination of the return. If the method so selected is approved, it shall be used in returns for all subsequent taxable years unless the Commissioner grants permission to use the other method. A statement of facts substantiating any deduction claimed under section 166 on account of bad debts shall accompany each return of income. Sec. 1.166-4, Income Tax Regs. Reserve for bad debts. (a) Allowance of deduction. A taxpayer who has established the reserve method of treating bad debts and has maintained proper reserve accounts for bad debts or who, in accordance with paragraph (b) of § 1.166-1, adopts the reserve method of treating bad debts may deduct from gross income a reasonable addition to a reserve for bad debts in lieu of deducting specific bad debt items. * * *
(c) Statement required. A taxpayer using the reserve method shall file with his return a statement showing - (1) The volume of his charge sales or other business transactions for the taxable year and the percentage of the reserve to such amount; (2) The total amount of notes and accounts receivable at the beginning and close of the taxable year; (3) The amount of the debts which have become wholly or partially worthless and have been charged against the reserve account; and (4) The computation of the addition to the reserve for bad debts.↩