BUDGET CREDITS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5697–65. Filed April 15, 1968.

*Miles Jaffe*, for the petitioner.
*Chauncey W. Tuttle, Jr.*, for the respondent.

OPINION

TANNENWALD, *Judge:* Respondent determined deficiencies in petitioner's Federal income tax for the fiscal years ended July 31, 1960, July 31, 1961, July 28, 1962, and July 27, 1963, of $13,000, $50,468.73, $26,676.25, and $9,880, respectively. In view of petitioner's concessions, the sole issue for determination is whether petitioner is entitled to deduct those additions to its reserve for bad debts for each of the fiscal years in question, which were computed by reference to accounts receivable sold by petitioner to a bank.

All of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

Petitioner is a Michigan corporation having its principal offices, at the time the petition herein was filed, in Detroit, Mich. It filed its Federal income tax returns for the taxable years in issue with the district director of internal revenue, Detroit, Mich.

Since 1948, petitioner has been the wholly owned subsidiary of Federal's, Inc., a Michigan corporation, the name of which for the years involved herein was Davidson Bros., Inc. This corporation will hereinafter be referred to as Federal's, Inc.

During the years in question, Federal's, Inc., operated a number of department stores in various cities. It made sales of tangible personal property for cash and extended credit terms, utilizing the forms and conditions of credit sales customarily followed in the retail business.

In each of the years in question, Federal's, Inc., sold, without recourse, to petitioner all of its accounts receivable arising out of sales in Michigan and Ohio together with any security interests retained.

During its fiscal year ended July 31, 1961, Federal's, Inc., acquired a number of stores in the States of New York and Ohio. It thereafter, on February 23, 1961, organized a New York corporation, B.C.I. Credit Corp. (hereinafter referred to as B.C.I.). Starting in May 1961, accounts receivable arising out of sales of tangible personal property by Federal's, Inc., in New York, together with security interests retained, were sold, without recourse, by Federal's, Inc., to B.C.I. and were then transferred by B.C.I. to petitioner. B.C.I. was organized and utilized because petitioner could not be admitted to do business in New York due to a conflict between its name and an unrelated New York corporation.

At all times since 1948, Federal's, Inc., has held all of the outstanding capital stock of petitioner. Since that time, petitioner has engaged in no business other than the financing of accounts receivable acquired from Federal's, Inc., and B.C.I. and arising out of sales by Federal's,

Inc., of tangible personal property, except that petitioner acquired certain accounts receivable from Federal's, Inc., which had in turn been acquired by it as part of its acquisition of certain stores in Ohio and New York and which arose from sales of tangible personal property by those stores prior to such acquisition.

The purchase and financing of the accounts receivable of Federal's, Inc., has been accomplished through petitioner, rather than directly by Federal's, Inc., for the primary reasons that advertising and goodwill advantages were obtained by avoiding legal actions for collection in the name of Federal's, Inc. Similar advantages were obtained from the ability to attribute refusal of credit to rules imposed by a corporation other than Federal's, Inc.

All of the accounts receivable purchased by petitioner were sold to Manufacturers National Bank of Detroit, Mich. (hereinafter referred to as the bank). The sales to the bank were without recourse, under an agreement whereby the bank retained 10 percent as a reserve and remitted the remaining 90 percent to petitioner. If an account receivable was in default, the bank could retransfer such account to the petitioner and charge the reserve accordingly. The bank received a fee in the nature of an interest charge for financing petitioner's accounts receivable. Federal's, Inc., was a party to the agreement, but bore no losses on accounts receivable sold by petitioner.

Petitioner did the accounting for and collection of the accounts receivable sold to the bank, except that B.C.I. did the accounting for and collection of New York accounts receivable. When no payment was received on an account receivable for 6 months, when the principal debtor went into bankruptcy, or when, for any other reason, it was believed by petitioner that the account receivable would not be paid, petitioner repurchased that account receivable from the bank, except that B.C.I., rather than petitioner, repurchased and bore such losses on New York accounts receivable.

Petitioner included the amounts of outstanding accounts receivable sold to the bank in determining its bad debt reserve. Respondent, in his statutory notice of deficiency, disallowed the increases to the reserve for bad debts claimed by petitioner in the taxable years 1960, 1961, 1962, and 1963 in the respective amounts of $25,000, $83,002.66, $41,997.34, and $20,000. The parties have stipulated that if petitioner is entitled to compute its reserve for bad debts by reference to the accounts receivable then these additions were proper.

The sole question before us, therefore, is whether petitioner may compute its additions to the reserve for bad debts by reference to the accounts receivable sold to the bank and with respect to which respondent has conceded that petitioner was a guarantor, endorser, or indemnitor.

Section 166 of the Internal Revenue Code of 1954, as it existed during the years in question, provided as follows:

(a) GENERAL RULE.—

(1) WHOLLY WORTHLESS DEBTS.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

(2) PARTIALLY WORTHLESS DEBTS.—When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.

(b) AMOUNT OF DEDUCTION.—For purposes of subsection (a), the basis for determining the amount of the deduction for any bad debt shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.

(c) RESERVE FOR BAD DEBTS.—In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts.

In applying these provisions, the courts were in controversy as to the allowance of additions to reserves for bad debts claimed by taxpayers who had sold the debt obligations to others. In a series of cases, we held that where a taxpayer had sold its accounts receivable to a bank or other financing entity, even though the taxpayer remained liable as a guarantor, it was not entitled to take a deduction for an addition to a reserve for bad debts because the debts were not owing to it but to another. We maintained our position despite reversals by the Court of Appeals.[1] See *Wilkins Pontiac* v. *Commissioner*, 298 F. 2d 893 (C.A. 9, 1961), reversing 34 T.C. 1065 (1960), *Foster Frosty Foods, Inc.* v. *Commissioner*, 332 F. 2d 230 (C.A. 10, 1964), reversing 39 T.C. 772 (1963), and *Bolling* v. *Commissioner*, 357 F. 2d 3 (C.A. 8, 1966), affirming in part and reversing in part a Memorandum Opinion of this Court; see *Mike Persia Chevrolet, Inc.*, 41 T.C. 198, 202 (1963).

As the direct result of this controversy, section 166 was amended in 1966 by Pub. L. 89–722, 89th Cong., 2d Sess., which added, *inter alia*, subsection (g), providing in pertinent part as follows:

(g) RESERVE FOR CERTAIN GUARANTEED DEBT OBLIGATIONS.—

(1) ALLOWANCE OF DEDUCTION.—In the case of a taxpayer *who is a dealer in property*, in lieu of any deduction under subsection (a) there shall be allowed (in the discretion of the Secretary or his delegate) for any taxable year ending after October 21, 1965, a deduction—

(A) for a reasonable addition to a reserve for bad debts which may arise out of his liability as a guarantor, endorser, or indemnitor of debt *obligations arising out of the sale by him of real property or tangible personal property* (including related services) in the ordinary course of his trade or business; and

\*        \*        \*        \*        \*        \*        \*

(2) DEDUCTION DISALLOWED IN OTHER CASES.—Except as provided in paragraph (1), no deduction shall be allowed to a taxpayer for any addition to a reserve for bad debts which may arise out of his liability as guarantor, endorser, or indemnitor of debt obligations.

[Emphasis supplied.]

---

[1] Respondent did likewise. Rev. Rul. 62–214, 1962–2 C.B. 72.

The amending legislation made subsection (g), under the circumstances of this case, retroactive to taxable years beginning after December 31, 1953, and ending after August 16, 1954. See sec. 2, Pub. L. 89–722.

Unquestionably, Congress clearly had the constitutional power to provide for such retroactive effect, since "the right to deductions in the computation of Federal income tax is a matter of legislative grace." See *Estate of Harris Fahnestock*, 2 T.C. 756, 759 (1943) ; cf. *Paul H. Travis*, 47 T.C. 502, 516 (1967), on appeal (C.A. 6, June 22, 1967). Under these circumstances, any reconsideration of our position as to the availability of a reserve for bad debts to guarantors, aside from the effect of section 166 (g), is effectively precluded.

We therefore confine ourselves to the applicability of section 166 (g). Paragraph (1) of that section requires that the taxpayer-guarantor be "a dealer in property" and that the obligations be those "arising out of the sale *by him* of real property or tangible personal property." (Emphasis supplied.) Clearly, petitioner does not meet the statutory description. Such being the case, petitioner cannot escape the impact of paragraph (2) of section 166 (g), which specifically provides that, except to the extent provided in paragraph (1), no deduction shall be allowed for any addition to a bad debt reserve by a taxpayer-guarantor.

Petitioner seeks to avoid the effect of the statutory provisions by asserting that if Federal's, Inc., had sold its accounts receivable directly to the bank, it would have been entitled to the benefits of section 166 (g) ; that the indirect method of sale to petitioner and by petitioner to the bank was adopted for valid business purposes; and that, section 166 (g) being remedial legislation, petitioner should be entitled to its benefits. However sympathetic we may be with this line of reasoning, we cannot agree. Petitioner and Federal's, Inc., were valid, separate entities and, indeed, petitioner does not contend otherwise. Such being the case, certain tax consequences flow from this separation and the parties must take the bitter with the sweet. *Interstate Transit Lines* v. *Commissioner*, 319 U.S. 590 (1943); *Moline Properties* v. *Commissioner*, 319 U.S. 436 (1943). Perhaps the Congress should have included the situation involved herein, but the fact remains that it did not do so. By unambiguous affirmative and negative language, it expressly limited the scope of subsection (g)[2] (cf. *Paul H. Travis, supra*) and we have no alternative but to apply its plain mandate. See, e.g., *United States* v. *Martin*, 337 F. 2d 171, 174–175 (C.A. 8, 1964).

---

[2] The committee reports leave no doubt that the Congress intended sec. 166(g) to have limited applicability. H. Rept. No. 2157, 89th Cong., 2d Sess. (1966) ; S. Rept. No. 1710, 89th Cong., 2d Sess. (1966).

In view of the foregoing, respondent's position must be sustained.[3]
Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

FAY, *J.*, dissenting: With all deference, I am unable to agree with the conclusion reached by the majority of the Court. It is my opinion that the literal statutory construction adopted by the majority is unnecessarily narrow and succeeds only in frustrating the purpose for which Congress enacted section 166(g).

In all of the litigation which preceded and was directly responsible for the enactment of section 166(g), essentially what was presented was a single-fact pattern. What transpired was an installment sale by a retail dealer to a purchaser who made a downpayment and executed a conditional sales contract for the balance of the purchase price The dealer then sold with recourse the conditional sales contract to a finance company or bank in order to acquire money to replenish his stock and acquire further inventory. See remarks of Mr. Schneebeli, 112 Cong. Rec. 25639 (1966).

In the above situation (see for example *Wilkins Pontiac*) we sustained the Commissioner's position that when the obligations were sold they no longer represented a debt owed the dealer, but constituted a debt owed to the finance company. On appeal, however, this position was rejected based upon the idea that the technical requirement that the debt be owing to the dealer on these facts ignored the realities of the business world. The reversal stressed the idea that in substance the risk of loss was always upon the dealer and to deny the deduction by limiting it to direct debt would be to defeat the purpose of the reserve for bad debts.

It is against this specific background that section 166(g) was proposed and enacted. In this light it is not difficult to understand why the subsection is worded as it is. The language of the enactment was couched exactly in terms of the problem presented in the prior litigation. The committee reports also adopt the same background in expressly limiting the scope of the subsection. Both reports make the following general explanation as to the limits of the applicability of the subsection:

*New reserve only way of taking guaranteed bad debt deductions for future.*— The bill provides that the new reserve previously described is to be the only reserve through which a deduction is to be allowed for any addition to a reserve

---

[3] Respondent has confined its attack to the additions to petitioner's bad debt reserve and has raised no question regarding the treatment of petitioner's bad debt reserve as it existed on the first day of the first taxable year before us. Similarly, respondent has conceded the reasonableness of the amounts of petitioner's additions without regard to the fact that the bank's right to charge petitioner with defaulted accounts receivable seems to have been limited to the amount in the retained reserve.

for bad debts which arises out of the taxpayer's liability as guarantor, endorser, or indemnitor of debt obligations. For example, *if the taxpayer has an account receivable from a customer* [emphasis supplied] simply for services rendered (not in connection with a sale of a property) the bill provides that no deduction is to be allowed for an addition to a reserve for liabilities arising out of the sale with recourse of such a debt obligation.

I do not contend that there is any specific statement in either the prior case law or the legislative history which evidences a realization of the problem now before the Court. In fact, I think it is clear that Congress did not foresee this variation of the problem. What I do contend is that the legislative history evidences a congressional purpose to adopt an attitude in this area which recognizes the realities of the business community. It is my opinion that Congress did not, as the majority suggests, intend the statute to be applied in so literal a fashion, for to do so ignores the business realities of this case.

What we have before us is a dealer-parent which indirectly through a *wholly owned subsidiary* is financing its trade receivables. Respondent has not questioned and the majority opinion even concedes the bona fide business purpose of this arrangement. The parent sells the receivables without recourse to the subsidiary which thereupon transfers them to a bank under an agreement which respondent has conceded renders the subsidiary potentially liable as a guarantor, endorser, or indemnitor.

Because technically the parent is the dealer and the wholly owned subsidiary is the guarantor upon which rests the risk of loss, under my reading of the majority construction neither will be entitled to the deduction. In contrast to this, had the parent dealt directly with the bank, it is clear that the deduction would be available to it. I do not believe such result is reasonable because in my opinion the two situations are not in substance distinguishable.

I, therefore, conclude that Congress would have intended section 166(g)(1)(A) to be sufficiently broad to encompass the case before us had they specifically focused on it and would not have intended the technical approach suggested by the majority.

SIMPSON, *J.*, agrees with this dissenting opinion.

---

SIMPSON, *J.*, dissenting: I agree with the views of Judge Fay, but I wish to add some of my thoughts.

Unquestionably, under a literal reading of the statute, this petitioner does not come within the terms of section 166(g) since it is not a dealer in property. However, I believe that more is expected of us than merely to adhere slavishly to a literal reading of the statute. I conceive the judicial office to include the responsibility of attempting to carry out the purpose of the legislation.

In enacting section 166(g), Congress made clear that it intended to provide only a limited opportunity for guarantors to establish reserves to cover their liabilities as such, and we must carefully attempt to carry out that purpose—to bring within the provision all those persons who were intended to be benefited, but not to extend it to unintended persons. The statute restricts the provision to dealers in property and to obligations arising out of the sale of real property or tangible personal property, and these restrictions are emphasized in the committee reports. Nothing is said about the situation involved in this case; but we should do more than merely read the words of the statute and the committee reports—we should analyze them to determine how this situation falls in relation to the apparent purposes of the legislation.

If Federal's, Inc., had not created the petitioner, but had retained the accounts receivable, it would have qualified under section 166(g). Thus, our question resolves down to whether this business should be denied the benefit of section 166(g) merely because it formed a separate legal person to which the accounts receivable were transferred. I am convinced that there is no reason to deprive the petitioner of the benefit of section 166(g); indeed, I am confident that Congress would not want it deprived of such benefit merely because the business activities were divided between two separate legal persons and the accounts receivable transferred to the petitioner. Under these circumstances, we are not impotent to carry out the purposes of the legislation; in fact, I believe that it is our responsibility to do so.

It has been suggested that if we depart from a literal meaning of the statute, other cases will arise that present us with the troublesome problems of where to draw the line. If we apply section 166(g) in this case, what would we do if the parent owned less than 100 percent of the stock or if the subsidiary was engaged in some other activity in addition to handling the accounts receivable of the parent. The possibility of such problems arising does not, in my opinion, justify our refusing to apply section 166(g) in this situation when it seems clear that the provision should be applied. I expect that we will be holding court for those taxpayers who want to raise the other problems, and we will decide them when they arise and we have all the facts before us.

FAY, *J.*, agrees with this dissenting opinion.