QUALITY CHEVROLET COMPANY, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5887–64. Filed June 10, 1968.

*Harold D. Rogers* and *Paul W. Eggers*, for the petitioner.
*James F. Hart*, for the respondent.

---

Simpson, *Judge:* The respondent determined deficiencies in income tax of the petitioner of $11,503.21 for its taxable year 1960, $1,708.28 for its taxable year 1961, and $10,319.77 for its taxable year 1962. The only issue remaining for decision is whether the petitioner may deduct additions to its reserve for bad debts to provide for anticipated losses due to the prepayments of promissory notes by its customers.

### FINDINGS OF FACT

All of the facts were stipulated, and those facts are so found.

The petitioner, Quality Chevrolet Co., Inc., was incorporated under the laws of the State of Kansas on April 3, 1958. Since that date, the petitioner has been engaged in the business of buying, selling, repairing, and servicing automobiles as an authorized Chevrolet dealer in Wichita, Kans., its principal place of business at the time the petition was filed in this case. The petitioner used the accrual method of accounting in maintaining its books and records and reporting its income for tax purposes. The petitioner has elected and established the reserve method of accounting for bad debts.

The petitioner sold substantially all of its automobiles and trucks on credit. When a sale was consummated, the customer executed a promissory note for the unpaid portion of the purchase price of the vehicle plus a carrying or finance charge and other incidental costs. The promissory note was an installment note for a term agreed upon by the petitioner and the customer.

During all of the years that the petitioner has been a Chevrolet dealer, it has followed the practice of selling most of the promissory notes received from customers to several financial institutions on a discounted basis. Such notes were sold either with full recourse against the petitioner or recourse limited to the amount of the dealer reserve.

In a typical credit sale, the petitioner and the customer agreed upon a cash price for the vehicle and the portion to be paid immediately and the portion to be deferred. To the deferred amount, a "time-price differential" or "carrying or finance charge," together with other incidental costs, were added to arrive at a total "contract balance." The customer then executed a negotiable promissory note to the petitioner in the amount of the contract balance and agreed to pay such amount in equal monthly installments over a designated period of time, such as 3 years. The petitioner then sold the installment note to a financial institution at a discount. The financial institution paid the petitioner the principal amount of the note and credited a portion

of the finance charge to a dealer reserve account in the name of the petitioner. A typical sale may be illustrated by the following example:

I. Sale of vehicle:
1. Cash price of vehicle_____ $4,000
2. Unpaid portion_____ $3,000
3. Finance charge and other incidental costs_____ 720

4. Contract balance or amount of installment note_____ 3,720

II. Sale of note:
1. Financial institution discount_____ $320
2. Credited to dealer reserve_____ 400
3. Paid to the petitioner_____ 3,000

Total_____ 3,720

The $400 in the example credited to the dealer reserve account represented the petitioner's participation in the finance charge based upon its full collection by the financial institution. The petitioner reported as accrued income on its returns all amounts credited to its dealer reserve accounts by the several financial institutions. Such amounts totaled $78,749.69 for 1960, $87,334.90 for 1961, and $132,697.27 for 1962. As of December 31 of each year, the petitioner carried outstanding accounts receivable due from the several financial institutions and relating solely to dealer reserve accounts in the amounts of $47,016.89 for 1960, $52,145.71 for 1961, and $59,094.10 for 1962.

During the years involved in this case, section 16–509 of the General Statutes of Kansas required a reduction in the finance charge in the event a customer prepaid the balance due on his note before its maturity date. In accord with the agreements between the petitioner and the financial institutions, when a prepayment occurred, the financial institution charged the petitioner's dealer reserve account with a proportionate part of the reduction in the finance charge, or the petitioner paid cash to the financial institution in the event that the dealer reserve account was insufficient to cover all of such charge. In the example given above, if the customer, after making a number of payments on the $3,720 note, prepaid the remaining balance of the note and was thereby entitled to a reduction of the finance charge in the amount of $160 under Kansas law, the financial institution would charge the petitioner's dealer reserve account for $88.89 or require the petitioner to pay that amount in cash. In the event of prepayment, the petitioner had no liability to the financial institution in excess of the amount originally credited to its dealer reserve account on each specific contract.

The amounts that were charged to the petitioner's dealer reserve account or paid in cash because of prepayments by customers totaled $15,396.31 for 1960, $12,730.78 for 1961, and $16,546.37 for 1962.

The petitioner elected on its first tax return to deduct bad debt losses on the reserve method of accounting. In computing its bad debt experience with respect to notes sold to financial institutions, the petitioner considered its loss experience from repossessions and also from prepayments by customers.

As of the date of trial, the statute of limitations was still open for assessment as to the petitioner's taxable years 1963, 1964, 1965, and 1966.

### OPINION

Our question is whether the petitioner may anticipate losses due to the prepayment of promissory notes by its customers by means of additions to its reserve for bad debts. Initially, other issues were raised in this case, but the parties now agree that the amounts credited to the petitioner's reserve accounts are includable in its income and that the petitioner may deduct additions to a reserve with respect to its repossession losses. Since the petitioner does include in its income its share of the anticipated finance charge, it is apparent that whenever the petitioner is unable to collect all of such previously accrued income, a real, economic loss is suffered, regardless of the reason for the inability to collect. The respondent concedes that such a loss is deductible at the time it occurs. However, the respondent's position is that a loss of anticipated income because of prepayment of a note is not a loss due to a "bad" debt, and therefore, such a loss may not be taken into consideration in computing a reserve for bad debts under section 166 of the Internal Revenue Code of 1954.[1] The petitioner argues that a loss because of prepayment of a note is a loss arising from a debt—a legal obligation to pay the total finance charges—and that such a loss is due to the debt being partially uncollectible under State law.

Our basic issue, thus, is not the deductibility of the loss of anticipated income due to the prepayment of the notes; rather, it is the narrower question of whether such losses may be anticipated for tax purposes by the establishment of a reserve. Accordingly, we have again the question of whether a reserve is to be recognized for tax purposes. To view that question in proper perspective, let us review the history of the issue.

In *Brown* v. *Helvering*, 291 U.S. 193 (1934), the taxpayer, a general agent for certain fire insurance companies, attempted to deduct addi-

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.

tions made to a reserve that had been established to provide for premium losses due to the cancellation of insurance policies. The Court stated that such additions were obviously not expenses paid during the taxable year; they were only bookkeeping charges. A liability may be treated as an expense incurred only if it has "accrued" during the taxable year, even though payment is not presently due. "But no liability accrues during the taxable year on account of cancellations which it is expected may occur in future years, since the events necessary to create the liability do not occur during the taxable year. Except as otherwise specifically provided by statute, a liability does not accrue as long as it remains contingent." (291 U.S. at 200)

*Brown* v. *Helvering, supra,* has been thought to establish the general rule that deductions cannot be taken for additions to reserves for contingent liabilities in the absence of specific statutory authority. However, there have been cases in which deductions were allowed for estimates for future expenses or losses when the liability seemed assured. E.g., *Schuessler* v. *Commissioner,* 230 F. 2d 722 (C.A. 5, 1956), reversing 24 T.C. 247 (1955) ; *Harrold* v. *Commissioner,* 192 F. 2d 1002 (C.A. 4, 1951), reversing 16 T.C. 134 (1951).

With the passage of the Internal Revenue Code of 1954, Congress provided in section 462 for the use of reserves for estimated expenses; at the same time, Congress, in section 452, provided for the deferral of prepaid income. The two sections were designed to eliminate the variances between tax accounting and business accounting by more nearly attributing income to the year in which it was earned and allowing deductions attributable to the activities of earning that year's income. However, because of transitional problems, sections 452 and 462 were repealed retroactively in the Act of June 15, 1955, ch. 143, 69 Stat. 134.

Since the repeal of sections 452 and 462, the courts have considered a number of cases in which taxpayers sought to defer income or anticipate expenses without specific statutory authorization to do so. On three occasions, the issue has been presented to the Supreme Court, and it has consistently refused to approve of the use of such accounting methods without statutory authorization. *Schlude* v. *Commissioner,* 372 U.S. 128 (1963) ; *American Automobile Assn.* v. *United States,* 367 U.S. 687 (1961) ; *Automobile Club of Michigan* v. *Commissioner,* 353 U.S. 180 (1957). In the *American Automobile Assn.* case, the Court said :

To recapitulate, it appears that Congress has long been aware of the problem this case presents. In 1954 it enacted § 452 and § 462, but quickly repealed them. Since that time Congress has authorized the desired accounting only in the instance of prepaid subscription income, which, as was pointed out in *Michigan,* is ratably earned by performance on "publication dates after the tax year." * * *

It has refused to enlarge § 455 to include prepaid membership dues. At the very least, this background indicates congressional recognition of the complications inherent in the problem and its seriousness to the general revenue. We must leave to the Congress the fashioning of a rule which, in any event, must have wide ramifications. The Committees of the Congress have standing committees expertly grounded in tax problems, with jurisdiction covering the whole field of taxation and facilities for studying considerations of policy as between the various taxpayers and the necessities of the general revenues. The validity of the long-established policy of the Court in deferring, where possible, to congressional procedures in the tax field is clearly indicated in this case. * * * [367 U.S. at 697]

The Tax Court has also considered a variety of situations in which taxpayers adopted one of these accounting methods, but in the light of the legislative history and the holdings of the Supreme Court, we have uniformly refused to approve of the deferral of income or the anticipation of expenses. E.g., *Artnell Co.*, 48 T.C. 411 (1967), on appeal (C.A. 7, Oct. 23, 1967) ; *Hagen Advertising Displays, Inc.*, 47 T.C. 139 (1966), on appeal (C.A. 6, Apr. 3, 1967) ; *Simplified Tax Records, Inc.*, 41 T.C. 75 (1963).

In the meantime, Congress has decided to allow the use of these methods of accounting under restricted circumstances. See sec. 166(g), *infra;* sec. 455 (prepaid subscription income) ; sec. 456 (prepaid dues income of certain membership organizations). Congress has acted on a case-by-case basis, and after considering the needs of the specific situation, it has allowed the deferral of income or the anticipation of expenses with appropriate restrictions and conditions.

From this history, we infer the proposition that the decision as to whether a taxpayer is to be permitted to defer income or anticipate expenses in any specific situation is to be left to Congress. The courts will not authorize the use of either of such accounting methods without specific statutory authorization.[2] When Congress does act, we will of course attempt to carry out the purpose of the legislation by approving of the reserves contemplated by Congress, but we should not extend the application of the legislation by analogy to other situations not contemplated by Congress.[3]

---

[2] This attitude of allowing reserves only when specifically authorized by legislation is not only consistent with the decision of this Court in *Budget Credits, Inc.*, 50 T.C. 52 (1968), but is also consistent with the views of the minority in that case. In that case, the question was whether a business was to be denied the tax benefit of sec. 166(g) because it formed a separate corporation to handle its credit obligations, and the minority thought that the application of sec. 166(g) should not be denied merely because of the technicality of separate incorporation. On the other hand, in the case before us, the question is whether a reserve is to be allowed for prepayment losses—an anticipated expense not specifically mentioned in the statute.

[3] This view applies to taxpayers who determine their tax under the general provisions of the tax law. However, such approach does not necessarily apply to taxpayers, such as insurance companies, for which the law recognizes a number of reserves in view of the peculiar nature of their business. See sec. 801 and following.

The petitioner in this case attempts to bring its cause within one of the new statutory authorizations, section 166(g), enacted in 1966 (Act of Nov. 2, 1966, Pub. L. 89-722, 80 Stat. 1151). This provision was enacted as a result of the controversy over whether dealers in personal property were entitled to establish reserves with respect to their liability as guarantors on the obligations which they accepted in payment for the property they sold and which they discounted with a financial institution. Section 166(g)(1) provides:

SEC. 166. BAD DEBTS.

(g) RESERVE FOR CERTAIN GUARANTEED DEBT OBLIGATIONS.—

(1) ALLOWANCE OF DEDUCTION.—In the case of a taxpayer who is a dealer in property, in lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) for any taxable year ending after October 21, 1965, a deduction—

(A) for a reasonable addition to a reserve for bad debts which may arise out of his liability as a guarantor, endorser, or indemnitor of debt obligations arising out of the sale by him of real property or tangible personal property (including related services) in the ordinary course of his trade or business; and

(B) for the amount of any reduction in the suspense account required by paragraph (4)(B)(i).

This provision is also made applicable to earlier taxable years, including the years in controversy in this case, under circumstances which the petitioner satisfies. Sec. 2, Act of November 2, 1966.

The petitioner argues that it is a dealer in personal property, it has elected to use the reserve method for bad debts, its loss resulting from the prepayment of the notes arises in connection with an obligation which it received in payment for personal property sold in its business, and its loss results from its liability to indemnify the financial institution. It supports its argument by referring to certain statements in the committee report accompanying the enactment of section 166(g) and claiming that such statements indicate that the reserve authorized by section 166(g) is to cover all contingent liabilities arising in connection with the obligation.

In our opinion, however, the petitioner's argument rests upon too loose a construction of the statute. The deduction allowed by section 166(g) is in lieu of the deduction allowed by section 166(a) for debts that become worthless. Also, the reserve authorized by section 166(g) is for a bad debt, and it is clear throughout the statutory provisions and the legislative history that the provision applies only to a reserve for the liability of a guarantor, endorser, or indemnitor which results from a debt becoming bad or worthless. The statements in the committee report referred to by the petitioner are taken out of context; when considered in context, it is clear that such statements relate to the liability resulting from a debt becoming worthless. Properly con-

strued, the only reserve authorized by section 166 (g) is for debts that become worthless.

The losses sustained by the petitioner as a result of the prepayment of the notes are not losses resulting from the worthlessness of a debt. A debt becomes worthless within the meaning of section 166 when it is uncollectible because the debtor is unwilling or unable to pay. However, the prepayment losses are not due to the debtor's unwillingness or inability to pay but occur because he chooses to satisfy the debts in advance of their maturity.

Our case is one in which the purchaser of the automobile, under Kansas law, does not have an unconditional obligation to pay the financial institution the face amount of his note. In the event of prepayment, his debt is fully satisfied by paying a lesser amount. The financial institution then has no legal redress against the purchaser. Likewise, the financial institution does not have an unconditional obligation to the petitioner to pay over the full amount of the dealer reserve account. The financial institution's obligation to the petitioner is conditioned upon full payment of the note by the purchaser. Thus, the full amount of the note cannot be collected, not because of a refusal or inability to pay on the part of the debtor, but because under Kansas law, the debtor does not owe the full amount.

The petitioner also relies upon a Memorandum Opinion of this Court in *Dixie Fowler* (26 T.C.M. 175, 36 P-H. Memo. T.C. par. 67,036 (1967)). That case involved a dealer in property who made sales on credit, discounted the obligations, and assumed the liability of a guarantor. He claimed a reserve for both his repossession losses and his prepayment losses. This Court held that under the effective date provisions of the Act of November 2, 1966, he was not entitled to deduct an addition to a reserve for bad debts since he had not established any such reserve timely. Accordingly, the Court did not hold that prepayment losses could be taken into consideration in computing a reserve for bad debts.

We conclude that when the petitioner suffers a loss because of prepayment of a note by a customer, the loss is not a bad debt loss within the meaning of section 166. Consequently, the petitioner is not entitled to the special treatment provided by Congress in that section, but must deduct its loss under the general rule of *Brown* v. *Helvering*, *supra*—in the year in which it occurs. Because of our conclusion, we do not have to decide whether the petitioner's situation falls more clearly under section 166 (c), on the theory that such losses were suffered on a direct debt from the financial institution to the petitioner, or under section 166 (g), on the theory that the petitioner was a guarantor of a debt.

In order to reflect the agreement of the parties concerning other adjustments in the notice of deficiency,

*Decision will be entered under Rule 50.*