HIGH PLAINS AGRICULTURAL CREDIT CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9170-72.    Filed November 12, 1974.

*Thomas H. Maxfield,* for the petitioner.
*Vivian T. Martinez, Jr.,* for the respondent.

OPINION

TIETJENS, *Judge:* The Commissioner determined the following deficiencies in petitioner's income tax:

| TYE Sept. 30— | Deficiency |
|---|---|
| 1967 | $2,107.76 |
| 1968 | 5,868.36 |
| 1969 | 16,050.93 |

The questions for decision are: (1) Whether section 166(g)[1] allows petitioner to deduct additions to a reserve for bad debts when those additions reflect loans and notes transferred with recourse to a bank; and (2) whether the Commissioner abused his discretion when he determined that, with regard to loans retained, no deduction for an addition to the petitioner's reserve

---

[1] All statutory references are to the Internal Revenue Code of 1954, unless otherwise stated.

was reasonable in the taxable years ended September 30, 1967, September 30, 1968, and September 30, 1969.

This case was fully stipulated pursuant to Rule 122, Tax Court Rules of Practice and Procedure. The facts which we deem necessary for decision will be referred to below.

Petitioner was incorporated under the laws of the State of Wyoming on July 10, 1961, and, at all times since that date, has been a corporation with its principal place of business in Cheyenne, Wyo. At all times relevant to this proceeding, petitioner was an accrual basis taxpayer. Petitioner's Federal income tax returns for its taxable years ending September 30, 1967, September 30, 1968, and September 30, 1969 (hereafter taxable years 1967, 1968, and 1969, respectively) were filed with the director, Service Center for the Southwest Region, Austin, Tex.

Petitioner "rediscounts" loans made to farmers and ranchers with the Federal Intermediate Credit Bank (hereafter FICB) in Omaha, Nebr. All loans are made for a 1-year period or less. Notes are transferred pursuant to an agreement entitled "General Rediscount, Loan, and Pledge Agreement" between petitioner and the FICB, dated September 22, 1961. Relevant portions of that agreement follow:

GENERAL REDISCOUNT, LOAN, AND PLEDGE AGREEMENT

between

FEDERAL INTERMEDIATE CREDIT BANK OF OMAHA

and

HIGH PLAINS AGRICULTURAL CREDIT CORPORATION,

A Wyoming Corporation

WHEREAS, it is contemplated that the Federal Intermediate Credit Bank of Omaha, hereinafter called the "Bank," will extend or continue financial accommodations to High Plains Agricultural Credit Corporation, a corporation organized under the laws of Wyoming, with its principal place of business at Cheyenne, Wyoming, hereinafter called the "Corporation," by discounting for or purchasing from the Corporation, with its endorsement, notes, drafts, or other such obligations of farmers or ranchers representing loans made for agricultural purposes, and by making loans or advances to the Corporation which shall pledge with the Bank approved collateral to secure such loans and advances and generally to secure all obligations discounted or purchased by the Bank and any and all other obligations of the Corporation to the Bank, as authorized by section 202 of the Federal Farm Loan Act, as now or hereafter

amended (12 U.S.C. 1031-1033), it is mutually agreed by and between the Bank and the Corporation as herein provided.

1. *Obligations of Farmers or Ranchers to be Offered*

The Corporation [petitioner] may offer to the Bank [FICB] for discount or purchase or as security for direct loans or advances, or as general collateral for any purpose, notes, drafts, or other such obligations of farmers or ranchers which meet the requirements of section 202 of the Federal Farm Loan Act, as now or hereafter amended (12 U.S.C. 1031-1033), and regulations of the Farm Credit Administration. As to all such obligations so offered, the Corporation represents, warrants, and agrees as follows:

(a) The proceeds of each obligation will have been advanced or used in the first instance for an agricultural purpose, including the breeding, raising, fattening, or marketing of livestock.

\* \* \*

(c) Each obligation shall be offered to the Bank with the endorsement of the Corporation, in form acceptable to the Bank; and the President, or any Vice President, or the Treasurer, or any Assistant Treasurer, of the Bank is authorized to endorse in the name and in behalf of the Corporation, as its attorney-in-fact, any such obligation that may be delivered to the Bank by the Corporation without its endorsement.

\* \* \*

(e) The Bank may reject at its discretion any and all such obligations so offered by the Corporation.

\* \* \*

(g) As to any such obligation discounted, purchased, or accepted as collateral by the Bank, which is not paid when due according to its terms or at any accelerated maturity date duly fixed by the holder, the Corporation agrees, upon request of the Bank, to repurchase such obligation or to transfer or assign to the Bank in substitution therefor other eligible obligations of like or greater value acceptable to the Bank. In lieu of making such a request and in the event the Corporation fails to comply with such a request if made, the Bank, at its option, may, without demand or notice to the Corporation, bring suit to collect such obligation not paid when so due, foreclose or sell any security therefor transferred or assigned to the Bank under the last preceding paragraph hereof, and take such other or additional steps to collect such obligation as the Bank deems appropriate, including extending the time of payment or renewing such obligation, directly and in the name of the Bank, without releasing the Corporation from its liability by reason of its endorsement of such obligation or its liability under this agreement, and without in any manner or to any extent releasing any collateral. If the Bank is unable to collect the full amount due it on any such obligation, the Corporation shall pay the Bank the amount of the deficiency.

(h) In the event the Bank incurs any expense in collecting or attempting to collect any such obligation, or files suit to collect thereon, the Corporation will pay to the Bank all such expense, court costs, and expenses of suit including a reasonable attorney's fee.

The following table sets forth information concerning the bad debt reserve for the petitioner for each of the years indicated, including the total amounts of loans receivable, the loans rediscounted to the FICB, and the claimed additions to the bad debt reserve account.

| Taxable year | Total loans receivable outstanding | Loans discounted to FICB | Claimed additions to bad debt reserve account |
|---|---|---|---|
| 9/30/65 _____ | $1,211,247.55 | $1,069,526.37 | $1,111.20 |
| 9/30/66 _____ | 1,940,130.89 | 1,774,823.44 | 9,537.28 |
| 1/31/67 _____ | 1,916,324.18 | (1) | 3,249.58 |
| 9/30/67 _____ | 1,899,683.77 | 1,741,878.34 | 6,663.78 |
| 9/30/68 _____ | 1,960,854.71 | 1,803,011.77 | 11,376.49 |
| 9/30/69 _____ | 2,625,434.81 | 2,488,778.37 | 30,399.50 |

1 Information not available.

Prior to the taxable year ended September 30, 1969, petitioner made no charges against the bad debt reserve account. In 1961, the year of petitioner's incorporation, it had no bad debt experience of its own on which to base a reasonable reserve for bad debts. As set forth in minutes of the board of directors of petitioner dated May 19, 1964, petitioner's reserve for bad debts was formally established "using a basis of one-half of one percent of the total outstanding loans as of the last business day of each fiscal year until such time as the reserve would equal three and one-half percent of the total loans at the end of any fiscal period."

Three accounts were charged off against petitioner's bad debt reserve balance during the taxable year ended September 30, 1969. The three accounts were the Melvin L. Hoke (hereafter Hoke) account, the Jimmy R. and Olinda McBride (hereafter McBrides) account, and the Paul Dean and Jean Ragland (hereafter Raglands) account.

On June 27, 1969, Hoke's loan balance with petitioner was $36,241 with a maturity date of January 31, 1969. On July 10, 1969, Hoke executed a new note to petitioner in the amount of $39,512.17 as a renewal of his then-existing balance plus interest up to and including that date. The note of July 10, 1969, was payable on or before January 10, 1970. On September 30, 1969, petitioner charged off $20,000 as a bad debt on the Hoke account. However, on August 31, 1970, petitioner recovered the entire $20,000.

Petitioner charged off $13,651.57 as a bad debt on the McBrides' account as of September 26, 1969. Petitioner,

however, recovered $800 of the debt on September 25, 1969, and the remaining $12,851.57 on January 12, 1970.

On April 30, 1968, Raglands' loan balance with petitioner was $32,904. In December, the Raglands filed a petition for discharge in bankruptcy, which was granted by the United States District Court for the District of Wyoming on February 18, 1969. On January 31, 1969, petitioner charged off $33,404.36 as a bad debt on the Raglands' account. Full recovery was made on June 18, 1969, of the amount from the originator of the loan.

Petitioner has conceded that it is not a dealer in property and that its customer debt obligations do not arise out of the sale of real property or tangible personal property.

The Commissioner determined that petitioner was not entitled to deductions of $6,663.78, $11,376.49, and $30,399.50 as additions to a reserve for bad debts in petitioner's taxable years 1967, 1968, and 1969, respectively. In his brief, the Commissioner argues that those additions are prohibited by section 166(g)(2) to the extent that they relate to loans transferred to the FICB and that, with regard to the loans retained, any addition to a reserve in 1967, 1968, and 1969 would be prohibited as unreasonable under section 166(c).

Petitioner argues that section 166(g)(2) does not preclude deductions for reasonable additions to a reserve relating to the loans discounted. Petitioner asserts that it is not a "guarantor, endorser, or indemnitor of debt obligations" and that, even if it is so classified, section 166(g)(2) does not limit the deductions claimed by a taxpayer who is not a dealer in property.

We start with several relevant facts which are contained in the stipulation and which neither party appears to dispute. Most of the "loans receivable" were "loans discounted to the FICB" according to a chart contained in the stipulation. Those loans were discounted under the provisions of the agreement, quoted in part above. Under paragraph 1(c) of that agreement, any obligation was to be offered to the FICB "with the endorsement of" petitioner. Under paragraph 1(g) of the agreement, petitioner agreed to repurchase or replace any discounted obligation "not paid when due." Alternatively, the FICB could try to collect such an obligation and collect from petitioner any uncollectable amount.

The facts, therefore, establish that petitioner was both an endorser and a guarantor. We do not understand petitioner to

dispute that formal relationship with the FICB. Instead, petitioner argues that, in substance, the agreement created rights and obligations which made petitioner "much more than a 'guarantor, endorser, or indemnitor' " as intended by section 166(g).

Petitioner asserts that guarantors, endorsers, and indemnitors are "liable only if the primary obligor defaults" and have only "secondary liability." Petitioner treats "primary liability" as the substantive fact which makes any formal endorsement or guarantee irrelevant. Petitioner states:

the presence of a guarantee or endorsement is not the critical factor under 166(g); rather, it is whether the transferor of the debt obligation remains primarily liable to the transferee for sums received in conjunction with the transfer. If he is primarily liable then there has been no intention to alter the debtor-creditor relationship of the debt obligation transferred and Section 166(g) has no application despite the presence of an endorsement or guarantee.

Petitioner asks us to examine the agreement and conclude that the parties did not "contemplate simply the sale of obligations with recourse," but, instead, intended "a continuing line of credit" secured by the notes and obligations transferred. Petitioner contends that it remained "primarily" liable to the FICB and that the FICB held the loans merely as security. Petitioner concludes that its primary liability exempted it from the restrictions of section 166(g) as petitioner interprets that section.

We are unwilling to accept petitioner's interpretation of the language of section 166(g). Distinctions between "primary" and "secondary" liability of a taxpayer are not relevant to the application of a provision which looks to debts owed to rather than by the taxpayer. Moreover, the history of section 166(g) indicates that that section is intended to treat petitioner as a guarantor or endorser even though petitioner may have had the primary responsibility for collecting from the makers of the notes. In *Wilkins Pontiac,* 34 T.C. 1065, 1066 (1960), revd. 298 F.2d 893 (C.A. 9, 1961), we denied a deduction for additions to a "Reserve for Losses on Contracts Discounted" where a taxpayer transferred sales contracts, "guarantee[d] payment of the full amount remaining unpaid" on the contracts, and "covenant[ed] if default be made in payment of any installment therein to pay the full amount then unpaid to * * * [the transferee] upon demand."

In that case, we explained our decision as follows (34 T.C. at 1068):

When petitioner sold its contracts to GMAC its position changed to that of endorser or guarantor. The debtors (petitioner's customers) were no longer debtors of petitioner but became debtors of GMAC. There were no debts owing to petitioner until it was required to pay the debtor's obligation to GMAC as a result of petitioner's contract with GMAC. * * * Consequently, there were no debts owing to petitioner at the end of 1955 to support a deduction for an addition to a reserve for bad debts. Section 166 of the Code does not permit a taxpayer to deduct a reserve for bad debts which are owed to someone else. [Citations omitted.]

Reversing our decision in *Wilkins Pontiac,* the Ninth Circuit stated (298 F.2d at 895):

Section 166(c) deals with a situation where a bona fide debt has not yet become worthless but where there is an existing risk of such a loss. The risk is every bit as real to this taxpayer under its contracts of guaranty as it would be were the debt now owed directly to it.

In other words, the Ninth Circuit did not dispute our conclusion that the taxpayer was a guarantor or endorser and that the debts under consideration were not "owed directly to it." But the Ninth Circuit held that such a taxpayer was nevertheless entitled to deduct additions to a reserve.

In *Foster Frosty Foods, Inc.,* 39 T.C. 772, 773 (1963), revd. 332 F.2d 230 (C.A. 10, 1964), a taxpayer was obliged to repurchase delinquent notes and accounts discounted to a bank if the taxpayer could not have the accounts made current or if the bank was not satisfied with the accounts. In that case, we relied on our decision in *Wilkins Pontiac,* and the Tenth Circuit relied on the Ninth Circuit's reversal. See also *Bolling v. Commissioner,* 357 F.2d 3 (C.A. 8, 1966), reversing on this issue a Memorandum Opinion of this Court; *Mike Persia Chevrolet, Inc.,* 41 T.C. 198 (1963).

Section 166 was amended in 1966 by Pub. L. 89-722, 89th Cong., 2d Sess., which added subsection (g). In its reports relating to that subsection, H. Rept. No. 2157 (to accompany H. R. 11782), 89th Cong., 2d Sess., p. 2 (1966), and S. Rept. No. 1710, 89th Cong., 2d Sess. (1966), the House and Senate committees indicated that the subsection represented a resolution of the question presented by *Wilkins Pontiac.* The committees explained the reason for section 166(g) as follows:

The Internal Revenue Service takes the position that a dealer in property is not entitled to take a current deduction, by use of a reserve for bad debts, for losses he expects to arise in subsequent years because of his sale with recourse of customer debt obligations. For example, if a dealer sells an article under a conditional sales contract and then sells the contract to a bank with the bank reserving the right to collect any bad debts from the dealer, the Internal Revenue Service holds that an addition to a reserve for bad debts on account of the dealer's contingent liability to the bank cannot be deducted for income tax purposes. The Treasury's position has been sustained in the Tax Court of the United States, but three circuit courts of appeal have held that a current deduction can be so taken against the future losses. The Commissioner of Internal Revenue has announced that he will not follow the circuit court decisions.[1] The bill is designed to settle the existing controversy as to the proper treatment of such cases for both future and past years.

[1] See, *Bolling et al. v. Commissioner*, 357 F. 2d 3 (8th Cir. 1966), reversing T.C. Memo. 1964-143; *Foster Frosty Foods v. Commissioner*, 332 F. 2d 230 (10 Cir. 1964), reversing 39 T.C. 772 (1963); *Wilkins Pontiac v. Commissioner*, 298 F. 2d 893 (9th Cir. 1962), reversing 34 T.C. 1065 (1960); *Mike Persia Chevrolet, Inc.*, 41 T.C. 198 (1963); see also *Bright v. Commissioner*, 66-2 U.S.T.C. para. 9606; and Rev. Rul. 62-214, C.B. 1962-2, 72.

We are convinced that, under *Wilkins Pontiac, Foster Frosty Foods,* and *Mike Persia,* we should have considered petitioner a guarantor and endorser, for petitioner's arrangement with the FICB was similar to the arrangements in those earlier cases.[2] We are further convinced that the Ninth and Tenth Circuits would have accepted our classification of petitioner although those courts might have disputed the tax ramifications of such a classification. We conclude that, since Congress looked to those cases and adopted their terminology, petitioner must be treated as a "guarantor" and "endorser" under section 166(g).[3]

Petitioner argues that, even if we find it a guarantor or endorser, section 166(g) applies only to dealers in property and section 166(g)(2) prohibits deduction only when it is claimed by such a dealer who does not meet the requirements of 166(g)(1)(A). The congressional committee reports, H. Rept. No.

[2] In several cases decided since the enactment of sec. 166(g), we have assumed, without explanation, that taxpayers were endorsers or guarantors under arrangements similar to that between petitioner and the FICB. See, for example, *Budget Credits, Inc.*, 50 T.C. 52 (1968), affirmed per curiam 417 F.2d 1108 (C.A. 6, 1969); *Paul H. Travis*, 47 T.C. 502 (1967), reversed on another issue 406 F.2d 987 (C.A. 6, 1969).

[3] Our conclusion is buttressed by the fact that the framers of the Uniform Commercial Code have termed an obligation similar to petitioner's a guarantee. Subsec. (1) of Uniform Commercial Code sec. 3-416, Contract of Guarantor, states that one who adds "payment guaranteed" to his signature on an instrument "engages that if the instrument is not paid when due he will pay it according to its terms without resort by the holder to any other party." That code does not limit "guarantee" to what petitioner calls "secondary liability."

2157, *supra* at p. 5, and S. Rept. No. 1710, *supra* at p. 5, refute petitioner's contention:

The bill provides that the new reserve previously described is to be the only reserve through which a deduction is to be allowed for any addition to a reserve for bad debts which arises out of the taxpayer's liability as guarantor, endorser, or indemnitor of debt obligations. For example, if the taxpayer has an account receivable from a customer simply for services rendered (not in connection with a sale of a property) the bill provides that no deduction is to be allowed for an addition to a reserve for liabilities arising out of the sale with recourse of such a debt obligation.

The language quoted above and the language of the statute indicate that Congress enacted section 166(g) as the exclusive provision for deductions for additions to the reserve of a guarantor, endorser, or indemnitor. See *Budget Credits, Inc.,* 50 T.C. 52, 56 (1968), affirmed per curiam 417 F.2d 1108 (C.A. 6, 1969); *Western Oaks Building Corp.,* 49 T.C. 365, 375 (1968); *Paul H. Travis,* 47 T.C. 502, 516 (1967), reversed on another issue 406 F.2d 987 (C.A. 6, 1969). We also note that, under section 166(g)(4), the suspense account, which the House committee considered important "to prevent a doubling up of deductions during the transition period," H. Rept. No. 2157, *supra* at p. 1, is required only of taxpayers maintaining the reserve established by 166(g)(1)(A). Certainly, if Congress had intended taxpayers like petitioner to deduct additions to a reserve, a similar suspense account would have been required of those taxpayers. Since petitioner is a guarantor and endorser and, by admission, is not a dealer in property, section 166(g)(2) precludes the deductions claimed.

We find no merit in petitioner's argument that section 166(g)(2) has no application to "taxpayers whose primary business is lending money." Petitioner says that Rev. Rul. 67-32, 1967-1 C.B. 52, shows that the Commissioner did not believe that section 166(g) applied to lending institutions. We cannot find such intent in a ruling dealing solely with production credit associations established under specific statutory authority. Similarly, we are not convinced of the validity of petitioner's use of sections 585 and 586 and their regulations as authority for an assertion that section 166 does not apply to lending institutions. Petitioner does not argue that it meets the requirements of sections 585(a) and 586(a), and, even if it did, those sections apply to taxable years beginning after July 11, 1969. Sec. 431(d)

of Pub. L. 91-172, 91st Cong., 1st Sess. (1969). We find no merit in petitioner's arguments concerning those sections and see no reason to discuss them further.

Petitioner's final argument relating to section 166(g)(2) is that, if that section prohibits petitioner's deduction of the claimed additions, the section violates equal protection principles embodied in the fifth amendment of the Constitution. An unconstitutional interpretation of the section, petitioner argues, cannot have been intended by Congress.

We do not believe that our interpretation of section 166(g) renders it unconstitutional. Congress has broad authority to grant one class of taxpayers deductions not available to another and to recognize differences between various kinds of business. See *Brushaber v. Union Pac. R.R.,* 240 U.S. 1 (1916), and the provisions held constitutional therein. As we said in *Charles E. Moritz,* 55 T.C. 113, 115 (1970), revd. 469 F.2d 466 (C.A. 10, 1972), certiorari denied 412 U.S. 906 (1973):

deductions are within the grace of Congress. If Congress sees fit to establish classes of persons who shall or shall not benefit from a deduction, there is no offense to the Constitution, if all members of one class are treated alike. *Brushaber* v. *Union Pac. R.R.,* 240 U.S. 1 (1916). Such classifications have traditionally been held to be constitutional. See *Shinder* v. *Commissioner,* 395 F.2d 222 (C.A. 9, 1968), affirming a Memorandum Opinion of this Court.[4]

Because we do not believe that limiting a deduction for additions to a reserve to those guarantors, endorsers, and indemnitors who are "dealers in property" is unconstitutional, we have no difficulty in interpreting section 166(g) as we do. In any event, regardless of the constitutional implications, "by unambiguous affirmative and negative language, * * * [Congress] expressly limited the scope of subsection (g) * * * and we have no alternative but to apply its plain mandate." *Budget Credits, Inc.,*

---

[4] We rely on our reasoning in that case despite its reversal by the Tenth Circuit. Reversal was based on the fact that classification "premised primarily on sex must be scrutinized," and the court said that such discrimination was "invidious." (469 F.2d at 470). The Tenth Circuit suggested that sex, like race, alienage, and national origin, is a classification inherently suspect. See *Frontiero v. Richardson,* 411 U.S. 677, 682 (1973) (opinion of Mr. Justice Brennan); *Kahn v. Shevin,* 416 U.S. 351 (1974) (dissenting opinion of Mr. Justice Brennan). See also *Shapiro v. Thompson,* 394 U.S. 618 (1969); *Bolling v. Sharpe,* 347 U.S. 497 (1954). We are concerned herein with a petitioner who is denied a deduction because he is not a "dealer in property," a status unrelated to any suspect classification.

*supra* at 56.[5]

Having studied petitioner's briefs, we are uncertain whether, after our decision that petitioner is not entitled to additions for the loans discounted, petitioner wants us to consider those arguments concerning the reasonableness of his claimed additions under section 166(c). Nevertheless, we have considered petitioner's arguments and have concluded that the Commissioner's determination, that, in taxable years 1967, 1968, and 1969, petitioner was not entitled to any addition to reflect those loans which were not discounted, was not an abuse of discretion and was not arbitrary. Accordingly, we sustain that determination. *Harold F. Brooks,* 63 T.C. 1 (1974); *James A. Messer Co.,* 57 T.C. 848, 865 (1972); *Petaluma Co-operative Creamery,* 52 T.C. 457 (1969); *Massachusetts Business Development Corp.,* 52 T.C. 946 (1969).

Petitioner's arguments are based primarily on comparisons of the reserve accounts, as augmented by the claimed additions, to "total loans outstanding," including loans discounted to the FICB. Such comparisons result in percentages of 1.7, 2.2, and 1.6 for taxable years 1967, 1968, and 1969, respectively. However, as the Commissioner points out, comparisons of the same reserves to loans not discounted result in percentages of 20.7, 27.8, and 30.4. We believe that the larger percentages more accurately reflect regulation 1.166-4(b)(1), on which petitioner relies, wherein the reasonableness of an addition is said to "depend primarily upon the total amount of debts outstanding as of the close of the taxable year * * * and the total amount of the existing reserve." Our discussion above indicates that debts discounted are not "debts outstanding" and, accordingly, are not relevant to the computation of a reserve.

Under the Commissioner's determination, petitioner had a reserve of $26,025.32 [6] at the end of its taxable years 1967 and

---

[5] We hold only that Congress intended sec. 166(g)(2) to prohibit petitioner's claimed deductions. We do not decide whether, as petitioner first argues in its brief, sec. 166(g)(2) so interpreted is unconstitutional. That question is not properly before us. *Allen F. Labay,* 55 T.C. 6, 14 (1970), affirmed per curiam 450 F.2d 280 (C.A. 5, 1971); *Estate of Mary Redding Shedd,* 37 T.C. 394 (1961), affd. 320 F.2d 638 (C.A. 9, 1963); *Calvert Iron Works, Inc.,* 26 T.C. 770 (1956); *Coca-Cola Bottling Co.,* 22 B.T.A. 686 (1931).

[6] In his brief, the Commissioner uses a reserve of $22,775.74, the reserve appearing as the Sept. 30, 1966, reserve on petitioner's tax returns. Petitioner uses $26,025.32, which is the Jan. 31, 1967, reserve on those returns and includes an addition of $3,249.58, which apparently was not disallowed by the Commissioner. The parties do not explain the discrepancy, but the difference is not particularly relevant to our conclusion, and we use petitioner's figure without deciding whether it is accurate or allowable.

1968 and loans not discounted of $157,805.43 and $157,842.94. These reserves seem reasonable especially in light of the fact that, prior to 1969, petitioner had no bad debt experience. Because of charges petitioner claimed in taxable year 1969, the Commissioner's determination seems to result in a reserve of zero at the end of that taxable year. We believe that there may be arguments against a determination resulting in a zero reserve at the beginning of taxable year 1970, but we cannot consider the determination arbitrary. See *Patterson v. Pizitz, Inc.,* 353 F.2d 267 (C.A. 5, 1965), certiorari denied 383 U.S. 910 (1966). Without deciding whether the debts were properly charged, we note that petitioner's recovery in taxable year 1970 of debts charged in 1969 would result, in part, in replenishment of the reserve. *Ira Handelman,* 36 T.C. 560, 568 (1961); *R. Gsell & Co.,* 34 T.C. 41, 57 (1960), reversed on another issue 294 F.2d 321 (C.A. 2, 1961); sec. 1.166-4(b)(2), Income Tax Regs. It is obvious that the Commissioner's determination allowed an ample reserve. *James A. Messer Co.,* 57 T.C. at 865; *Black Motor Co.,* 41 B.T.A. 300 (1940), affd. 125 F.2d 977 (C.A. 6, 1942). We conclude that the Commissioner's determination was not an abuse of his discretion.

*Decision will be entered for the respondent.*