COLLEGIATE CAP AND GOWN COMPANY, Transferee, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Collegiate Cap & Gown Co. v. Commissioner
Docket No. 4018-69.
United States Tax Court
T.C. Memo 1978-226; 1978 Tax Ct. Memo LEXIS 290; 37 T.C.M. (CCH) 960; T.C.M. (RIA) 78226; June 19, 1978, Filed *290 Petitioner, Collegiate Cap and Gown Company, was transferee of Cap and Gown Company. Under petitioner's accounting method it deferred reporting prepaid income until the taxable year the services which related to that prepaid income were performed which was the taxable year following the taxable year of receipt. Cap and Gown consistently reported its income in this manner since at least 1954. Held, the result in this case is controlled by the case of Artnell Co. v. Commissioner,400 F. 2d 981 (7th Cir. 1968), revg. and remanding 48 T.C. 411 (1967), supp. opinion T.C. Memo. 1970-85, under our rule in Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F. 2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). We hold the method of accounting herein employed clearly reflected income. William A. Cromartie,Glen H. Kanwit, and Garland H. Allen, for the petitioner. James F. Hanley, Jr., for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: We have previously held petitioner to be liable as transferee of Cap and Gown Co. (hereafter Cap and Gown) under section 6901. [1]Collegiate Cap and Gown Company, Alleged Transferee of Cap and Gown Company v. Commissioner,59 T.C. 449 (1972). *291 We must now determine the extent of that liability. Respondent disallowed a portion of petitioner's net operating loss generated in the period August 1, 1965, through July 27, 1966, as a result of his determination that petitioner improperly accounted for advance payments. This gave rise to the following deficiencies in Cap and Gown's Federal income tax: Fiscal Year
Deficiency
7-31-63
$ 135,827
7-31-64
163,958
Certain concessions having been made, the issues remaining for our decision are: (1) whether the method of accounting for advance payments used by Cap and Gown on its 1966 tax return clearly reflected income as required by section 446(b); and, if not, (2) whether the Chief, Review Staff, Audit Division, Office of the District Director of the Internal Revenue of Springfield, Ill., had been delegated the authority to make a section 446(b) determination and, if so, whether he was actually the person who made such determination and whether he made such determination based on a consideration of the factors made relevant by section 446(b) and the regulations thereunder. FINDINGS *292 OF FACT Some of the facts have been stipulated. The stipulation of facts [2] along with attached exhibits are incorporated herein by this reference. However, because of our resolution of the first issue, only facts pertinent to a resolution of that issue will be set forth below. Petitioner, Collegiate Cap and Gown Co., is a Delaware corporation which was incorporated on January 27, 1966, having its principal place of business at 1002 North Market Street, Champaign, Ill. Cap and Gown Co. was a Delaware corporation incorporated on May 11, 1949, and had its principal place of business at 1002 North Market Street, Chapaign, Ill. Cap and Gown was an accrual method taxpayer using a fiscal year ending July 31. Cap and Gown filed its Federal income tax returns for its fiscal years ending July 31, 1963, and July 31, 1964, with the District Director of Internal Revenue at Springfield, Ill.
During the year ending July 27, 1966, Cap and Gown *293 and petitioner were parties to a reorganization within the meaning of section 368(a)(1)(C). On May 2, 1966, the business of Cap and Gown and substantially all of its assets were transferred to petitioner pursuant to an agreement and plan of reorganization dated February 10, 1966. After May 2, 1966, the operations formerly conducted by Cap and Gown were carried on by petitioner. On or about January 5, 1967, a corporation application for tentative refund from carryback of net operating loss (form 1139) dated January 5, 1967, was filed with respect to Cap and Gown's taxable year ending July 31, 1966. The tentative refunds for the carryback of the claimed net operating loss of Cap and Gown from the fiscal year designated as ending July 31, 1966, to the fiscal years ending July 31, 1963, and July 31, 1964, were paid as refunds of income tax and interest thereon to Cap and Gown by two checks dated February 7, 1967. On May 13, 1969, respondent issued a statutory notice of deficiency to petitioner. The statutory notice propoed a number of adjustments to Cap and Gown's taxable income for its fiscal year August 1, 1965, through July 27, 1966. These adjustments had the effect of reducing *294 the reported taxable loss of $ 1,241,379 to $ 649,651. This, in turn, reduced Cap and Gown's carryback of its net operating loss, resulting in deficiencies in petitioner's Federal income tax as transferee of Cap and Gown in the amounts of $ 135,827 and $ 163,958, plus interest thereon as provided by law, for Cap and Gown's taxable years ended July 31, 1963, and July 31, 1964, respectively. During the period in issue, the business of Cap and Gown consisted of the manufacture, sale, and rental of graduation apparel, accessories, choir robes and religious apparel. In its fiscal year ended July 31, 1965, Cap and Gown's revenues were comprised of approximately 44 percent sales and 56 percent rentals of graduation and religious apparel. Cap and Gown's geographic market for both sales and rentals was nationwide, with high schools comprising its largest class of rental customers. In both fiscal 1964 and 1965 Cap and Gown rented over a million units, as it did in fiscal 1966; however, during the period August 1, 1965, through April 30, 1966 (the approximate date of the transfer) only 152,093 units were rented. Since the majority of Cap and Gown's rental business was at graduations, the peak *295 season occurred in the months of May and June, with approximately 59 percent occurring in May and 31 percent in June. During the time of Cap and Gown's peak activities in May and June, its employment staff was approximately double its normal size of 500 to 550, increasing to approximately 900 to 950 personnel. The keystone of Cap and Gown's business was to encourage continuity with its institutional customers. Institutions were encouraged to enter into agreements generally covering a period of three years, and occasionally extending for five years. Under these agreements the institutions were assured of a sufficient supply of caps and gowns to meet the needs of their graduating classes in the years covered by the agreement, while Cap and Gown was assured of a steady supply of business, enabling it to predict accurately inventory requirements well in advance of the peak graduation months. The services performed by Cap and Gown were to provide a correctly sized cap and gown for each student with representatives of the company often assisting in distributing the caps and gowns, collecting payments, and picking up the caps and gowns after completion of the graduation. In the fall of *296 each fiscal year, Cap and Gown salesmen solicited from each institution previously serviced by the company, as well as from potential new customers, reservations for graduation apparel for the next graduating class. Each customer was provided with a document containing written instructions for ordering caps and gowns, together with a booklet describing the services included. It was the responsibility of Cap and Gown's salesmen to coordinate with each institution a date for taking measurements of the graduates, with measurement data for each graduate entered on an IBM card for processing into the company's computer. Each customer returned with the measurements an order form summarizing the quantities, styles, materials and colors of caps, gowns, collars and tassels required. Each order form was acknowledged in writing by Cap and Gown. With each reservation received, the pertinent data was entered into the company's computer, so that Cap and Gown had available precise data indicating quantities and types of inventory available for further orders. It was at the time an institutional customer submitted to Cap and Gown measurements for individual students' caps and gowns that the institutions *297 were encouraged to collect Cap and Gown's fees and remit them to Cap and Gown. Throughout its fiscal year, Cap and Gown manufactured graduation and religious apparel both for sale and rental. With respect to rental stock used in the previous year, Cap and Gown's practice was to remove these items from the boxes in which they were returned to the company, make necessary repairs, clean and press the apparel, box them, and replace them in inventory for use in the succeeding year. This process was carried on by the company throughout the fiscal year so the company's personnel could be as fully utilized as possible throughout the year. With the approach of the peak graduation months of May and June, Cap and Gown commenced prepacking orders (as early as mid-January) to the extent permitted by its plant space. This prepacking process consisted of pulling from stock gowns already boxed in the proper style, color and sizes, and placing stickers on each boxed gown showing the name of the graduating student and data concerning the style, color and size of his or her order. To each boxed gown was then added a cap, the proper collar (for female students) and accessories, such as tassels or *298 honor cords. Each cap and gown unit was then boxed in a carton containing ten units and the cartons were then assembled into one complete order. Depending on the time of the year and the volume of business being done by Cap and Gown at that time, orders were shipped anywhere between 3 and 21 days prior to the first scheduled usage date. Also, if the size of the institution warranted it, Cap and Gown salesmen would, as indicated earlier, assist in distributing caps and gowns to students and in repacking caps and gowns after the usage date for return to the company. Cap and Gown's billing practice was to mail invoices to its customers promptly after the orders were shipped, with "net 10 days" terms for payment. [3] *299 Invoices in use by Cap and Gown in its fiscal 1966 period contained the legend "Usage of the following apparel indicates final acceptance of the terms of this order." Cap and Gown's stated policy with respect to cancellations of orders was to request notice from its institutional customers 21 days prior to the usage date. However, in order to maintain customer satisfaction and continuity, Cap and Gown permitted cancellation of individual student orders if the cap and gown were not used by the student, even though advance notice of the cancellation was not given. If such a cancellation was made, Cap and Gown did not attempt to collect the fee, and if an advance payment had been made, Cap and Gown made a refund on the cancelled order when requested. There was no instance in which a *300 student who did not use his or her cap and gown and who cancelled his or her order was subjected to any collection efforts by Cap and Gown. In Cap and Gown's normal fiscal year running from August 1 to July 31, approximately 10 percent of the company's revenues were received in the form of advance payments, or payments made by institutions prior to the time Cap and Gown rendered invoices to its customers. When an advance payment was received from a customer, Cap and Gown prepared a cash voucher showing the name of the customer, the amount and date of the remittance, and the reservation number used for the customer's order. The purpose of the cash voucher was to create a written record of the customer's payment on its order. At the time of invoicing, the invoice number and date were entered on the cash voucher form. With respect to payments made by customers in advance of the normal invoicing date, Cap and Gown's accounting practice was not to recognize these payments as income at the time of receipt because Cap and Gown did not consider the advance payments to be earned as income until the graduation apparel was actually used by the student. Therefore, advance payments were not *301 credited directly to the company's income account at that time. Instead, the cash account was debited and an undistributed receipts account was credited. At the time invoicing occurred (which was shortly after the shipping date) on an order for which an advance payment had been made, the undistributed receipts account was debited for the amount of the advance payment and a corresponding credit was made to the accounts receivable account. At the same time the accounts receivable account was debited for the full amount of the invoice, with a corresponding credit to an income account. Advance payments which were in the undistributed receipts account at the end of any fiscal year of Cap and Gown, including its 1966 fiscal year, were treated as earned by Cap and Gown (Collegiate Cap and Gown in the case of Cap and Gown's final taxable year) in the succeeding fiscal year if not refunded. Cap and Gown followed this method of accounting consistently in its 1963 through 1966 fiscal years. Moreover, Cap and Gown had followed the same method at least since 1954. The expenses relating to the operations were generally incurred ratably over Cap and Gown's fiscal year except for the peak load *302 months of May and June when the expenses increased, primarily in the areas of assembling, packing and shipping orders. The accounting method of Cap and Gown with respect to expenses was generally to treat expenses as period costs charged against income at the time the expenses were incurred. However, four categories of direct expenses--transportation expense, rental stock depreciation, profit sharing contribution, and commissions--were deferred in part to Cap and Gown's next fiscal year in order to match the amount of deferred income in the advance payment account at the end of that fiscal year. For its 1966 fiscal year, the financial statements of Cap and Gown were audited by the accounting firm of Seidman and Seidman. The auditors determined that Cap and Gown's financial statements for fiscal 1966 had been prepared in accordance with generally accepted accounting principles and a clean opinion on the financial statements reflecting that judgment was issued by the accounting firm. Implicit in that opinion was the determination that the accounting treatment for the advance payments and expenses was proper under generally accepted accounting principles. OPINION We are confronted *303 with an extremely difficult issue as to the applicability and effect of Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F. 2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971), on the facts before us. Golsen "requires us to follow a Court of Appeals decision which is squarely in point where appeal from our decision lies to that Court of Appeals and to that court alone." In this case appeal lies to the Seventh Circuit which has previously dealt with the taxability of advance payments in the case of Artnell Co. v. Commissioner,400 F. 2d 981 (7th Cir. 1968), revg. and remanding 48 T.C. 411 (1967), supp. opinionT.C. Memo. 1970-85. Thus, that decision must be carefully examined to see if it controls our decision herein. Artnell concerned timing the recognition of income from prepaid admissions to baseball games. As in the case before us, what otherwise would have been the normal taxable year of the Chicago White Sox was ended early due to its "acquisition" by the taxpayer (transferee) prior to the team's regular year end. As a result of this midyear acquisition, a large portion of the prepaid admissions had not yet been earned as income and were not included in the team's *304 return for the year of acquisition. The Tax Court upheld the Commissioner's position that an accrual method taxpayer could in no event defer the taxation of prepaid income beyond the taxable year of receipt because to do so was per se not a clear reflection of income and contrary to the requirement of section 446. However, the Court of Appeals disagreed and stated, "there must be situations where the deferral technique will so clearly reflect income that the Court will find an abuse of discretion if the commissioner rejects it." Artnell at 400 F. 2d 985. In Artnell, the Court of Appeals distinguished the trilogy of Supreme Court decisions which had denied the deferral of prepaid income, Schlude v. Commissioner,372 U.S. 128 (1963); American Automobile Ass'n v. United States,367 U.S. 687 (1961); Automobile Club of Mich. v. Commissioner,353 U.S. 180 (1957), finding that the objection of the Supreme Court was not to the deferral of prepaid income per se, but to the uncertainty as to when the prepaid income would be reported by each of the taxpayers in those cases. It found that the taxpayer before it and the type of prepaid income there involved did not suffer from the same uncertainty *305 as to when it would be reported; rather, it would be reported as of specific dates (the dates on which the baseball games were played) in the following taxable year. Thus, having decided that deferral of prepaid income could, at least in some cases, clearly reflect income, the Court of Appeals remanded the case for a determination of whether the taxpayer's method of accounting met that standard. On remand we found the team's method of accounting clearly reflected income. The position of the Seventh Circuit was reaffirmed in Automated Marketing Systems, Inc. v. United States, an unreported case ( N.D. Ill. 1974, 34 AFTR 2d 74-5427, 74-2 USTC par. 9711), affd. by unpublished order (7th Cir. 1975). [4] In that case a corporation was acquired by the taxpayer midway through its taxable year. The acquired corporation was in the business of selling sales follow-up programs to automobile dealers. Payment was made in advance for services to be rendered by the acquired corporation over a period of between twelve and thirty months. At the time of acquisition, the acquired corporation had a large amount of prepaid income. The Seventh Circuit affirmed the District Court decision which held *306 that the deferral of prepaid income in that case clearly reflected income. [5]
It is clear that Artnell controls in the case before us. However, Artnell *307 held only that deferral of prepaid income may clearly reflect income in certain instances. We must now examine the method used herein to determine if it clearly reflects income. We believe the best way to proceed in such an inquiry is to compare the accounting system in issue in Artnell, which we found did clearly reflect income, Artnell Co. v. Commissioner,T.C. Memo. 1970-85, with the accounting system used by Cap and Gown. First of all, the factor which the Court of Appeals in Artnell deemed most important existed with respect to the performance of Cap and Gown, that is, certainty as to the time of the future performance. Additionally, here, as in Artnell, the taxpayer's policy of permitting cancellations up to the time of performance weighs in favor of deferring recognition of prepaid receipts as income. This is due to the uncertainty as to whether the prepaid receipts would ever be earned. Here, as in Artnell, direct and indirect expenses were deducted in the year when they were incurred. However, in the case of Cap and Gown, four categories of direct expenses were not deducted until the following fiscal year when the related income items were actually earned. Thus, at *308 least to that extent, Cap and Gown's accounting method more clearly matched income and related expenses than did the accounting method utilized by the baseball team in Artnell. Finally, there is no question as to the acceptability of Cap and Gown's method of accounting practices under generally accepted accounting principles. The petitioner has not only provided us with the "clean opinion" of Cap and Gown's auditors and their testimony as to compliance with "generally accepted accounting principles" but has also provided us with the expert testimony of a certified public accountant not associated with the audit of Cap and Gown's financials, to the effect that Cap and Gown's method of accounting complied with generally accepted accounting principles. Because Golsen mandates that we follow Artnell (without necessarily implying that we accept the Seventh Circuit's approach in comparable cases not appealable to that Circuit S. Garber, Inc. v. Commissioner,51 T.C. 733 (1969); Quality Chevrolet Co. v. Commissioner,50 T.C. 458 (1968); New England Tank Industries, Inc. v. Commissioner,50 T.C. 771 (1968)) and because the same factors which led us to find the accounting system in Artnell *309 clearly reflected income exist herein, we hold Cap and Gown's method of accounting clearly reflected income. In order to reflect the agreement of the parties as to other adjustments, Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the taxable years in issue.↩
2. The facts stipulated to in this proceeding include the stipulation of facts and supplemental stipulation which were part of the record in the previous proceeding in addition to a second supplemental stipulation filed specifically for this proceeding.↩
3. The record is confusing as to just when payment was normally made. Testimony at trial indicated that payment was generally due at graduation date or a few days thereafter. However, testimony also indicated that Cap and Gown attempted to send out a shipment three weeks prior to usage, and that invoicing would occur within a few days. Thus, if shipment was made three weeks prior to graduation and invoicing was made a few days after shipment, with net 10 days terms for payment, payment would fall due prior to graduation, apparently contradicting the statement that payment was generally due at graduation or a few days later. An apparent explanation would be that three weeks prior to usage was a target date and as the graduation season became busier, shipments were made closer to usage date, thus making usage date and payment date nearly coincide as per the testimony.
4. Absent Artnell, we might question the necessity of applying Golsen based only on the Automated Marketing Systems case. See Ruegsegger v. Commissioner,68 T.C. 463 (1977) and Circuit Rule 35(b)(2)(iv), Rules of the United States Court of Appeals for the Seventh Circuit which states: Except to support a claim of res judicata, collateral estoppel or law of the case, [unpublished orders] shall not be cited or used as precedent (a) in any federal court within the circuit in any written document or in oral argument or (b) by any such court for any purpose. However, given the existence of the Seventh Circuit's decision in Artnell, we do not need to decide such an issue. The affirmance in the Automated Marketing Systems case does make clear that the rule in Artnell↩ continues as the rule in the circuit. 5. Actually, the deferral to which the Comissioner objected was of billings applicable to future expenses. At year-end some of those billings had been paid (thus prepaid income), but the Commissioner objected to deferral of the entire amount.↩